UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ERGON - ST. JAMES, INC., ET AL. | CIVIL ACTION |
| VERSUS | NO: 15-1121, c/w 15-1137, 15-1206 |
| PRIVOCEAN M/V, ET AL. | SECTION: "A" (3) |

## ORDER & REASONS

On May 6, 2015, the Court held a hearing in the above-
captioned matter.  Initially set on the Motion to Lift Vessel
Arrest (Rec. Doc. 23) filed by plaintiffs in limitation Privocean
Shipping, Ltd. and Bariba Corp., related briefing focused on the
issue of valuation.  Claimants argue that the amount of security
provided by Privocean, $19,000,000.00, should be increased to
closer to $30,000,000.00.  As such, the Court construed such
opposition as a motion to increase security filed by Claimants
Ergon-St. James, Inc., Bravo Shipping, Ltd., and Crescent Towing
& Salvage Co., Inc.  The parties presented expert testimony at
the hearing and provided both pre and post-hearing briefing on
this issue.

## I.    Background

The M/V PRIVOCEAN was moored at the Convent Marine Terminal
with the assistance of two tugs, the M/V NED FERRY and the M/V
TEXAS.  The M/V BRAVO ("Bravo") was moored at the Ergon - St.

James, Inc. dock (Ergon) with the assistance of two other tugs.
All tugs were owned by Crescent Towing & Salvage Co., Inc.
("Crescent").

At 4:00 p.m. on April 6, 2015, the Privocean broke loose
from its moorings and, with the tug M/V Texas still attached,
allided with the Bravo and pushed the Bravo into the Ergon dock,
allegedly causing substantial damage to the Bravo, the Ergon
dock, and, according to Crescent, all four tugs and their crews.

Ergon filed its Complaint on April 9, 2015, and a warrant
for arrest of the vessel issued the same day.  Bravo filed its
Complaint on April 10, 2015, and a warrant for arrest of the
vessel issued the same day.  Crescent intervened on April 14,
2015.  Finally, on April 15, 2015, Privocean filed its Complaint
for Limitation.

All previous issues concerning security have been resolved,
and the arrest was lifted by previous order of this Court.  (Rec.
Doc. 40).  The only issue now before the Court is valuation of
the vessel for purposes of setting the proper amount of security
for the limitation fund to be provided by plaintiffs in
limitation.

## II.  Discussion

In a limitation action, security posted should reflect the
fair market value of the vessel and any pending freight at the

end of the voyage.[1]   The Court has great discretion, within that
general confine, "in determining what constitutes appropriate
security."  *In re Clearsky Shipping Co.*, no. 96-4099, 1997 WL
472663, at *2 (E.D. La. Aug. 18, 1997).   While comparable and
contemporaneous sales are generally the best evidence from which
to establish market value, the Court may also consider factors
such as "the opinion of marine surveyors, engineers, the cost of
reproduction, less depreciation, the condition of repair in which
the vessel was in, the uses to which it can be put, the amount of
insurance that the underwriters have issued, and the like" where
it finds the evidence of such sales is insufficient.  *Carl
Sawyer, Inc. v. Poor*, 180 F.2d 962, 963 (5th Cir. 1950); *see King
Fisher Marine Srvc., Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1185
(5th Cir. 1984).

**a. Value of the Vessel**

The M/V Privocean is a Panamax Bulk Carrier built in 2013 in
South Korea.  It has a dead weight tonnage of 81,434.  The
Privocean had been trading for approximately two years at the
time of the incident.

Plaintiffs in limitation state that the vessel of the value
should be placed at $19,000,000.00.  Privocean's expert, Anthony

---

[1] There is no dispute that the voyage concluded on May 19, 2015.

Charles English ("English"),[2] compiled a report of vessels sold

in February, March, and April of 2015.

English identified five Panamax class vessels in his report.

Four were built in South Korea and one was built in Japan.[3]

Three of the vessels were built in 2011; one was built in 2010;

and one was built in 2012.  They sold, in order of date of sale,

for the following amounts: $16,500,000; $18,400,000; $17,500,000;

$17,200,000; $17,700,000.  English testified that he chose a 5%

per annum depreciation rate to attempt to account for difference

in age of construction, and concluded that a valuation of

$19,000,000 would be accurate.  During the hearing, English

further explained that he believes that this figure is consistent

with the market conditions as of the date of the incident for

---

[2] In post trial briefing, Claimants seek to exclude the testimony
of English.  They argue that he is not qualified to be an appraiser.
At the evidentiary hearing, the Court found that he was qualified to
testify as an expert in ship brokerage and valuation.  The Court
invited counsel to explain in post-hearing briefing why the Court
should instead look exclusively at the testimony of an appraiser.
Having reviewed that briefing, the Court finds the arguments
irrelevant in light of the analysis undertaken by English.  English is
eminently qualified to provide testimony on the sales of such ships,
as is Strouse.  He has run his own ship brokering company for more
than forty (40) years, is a fellow in the Institute of Chartered Ship
Brokers and a shareholder in the Baltic Exchange, and has given
testimony on ship selling and purchasing in courts and arbitrations
around the world.  As English was not asked to nor attempted to
provide any testimony outside of these limits, nor attempted to be
qualified as an expert in fields beyond those that encompass such
observations, the Court does not find that his testimony should be
disregarded.

[3] According to expert testimony, the country of build correlates
to quality of build and would thus be relevant for determining
comparable sales.  The Privocean was built in South Korea.

Panamax bulk carrier charter rates and pointed to a compilation of figures through March 3, 2015 to support this opinion. Crescent Ex. 11.[4]

The Court finds that these sales are not sufficiently comparable to form the sole basis on which to determine the fair market value at the end of the voyage.  The Privocean was a 2013 built vessel; none of the ships listed by Strouse had the same build year.  *See Crescent Towing Salvage Co., Inc. v. M/V CHIOS BEAUTY*, no. 05-4207, 2008 WL 5264268, at *4 (E.D. La. Dec. 16, 2008)(noting that the "same year of construction" is a persuasive factor in finding a comparable sale).  In fact, Strouse, who, unlike English, is a member of the American Society of Appraisers and adheres to the Uniform Standards of Professional Appraisal Practice (USPAP) and FIRREA, disregarded the sales relied on by English for this same reason due to the difference of additional deterioration between vessels built in separate years. Additionally, Strouse, unlike English, performed a personal inspection of the Privocean.  Strouse, based on his inspection and documentation of the state of the Privocean, reported that he "was amazed at the relatively good condition . . . , [that] the maintenance was excellent . . . , [and that] [t]he condition was

---

[4] Although not dispositive to its ruling, the Court notes that English testified that if he had been asked to do a valuation for the date of the end of the voyage, May 19, 2015, instead of April 6, 2015, he "would possibly come up with a different figure."

near new."  The Court thus finds it appropriate, while still

considering the possible affect of the market, to also take other

factors into consideration to determine the value of the

Privocean.[5]

To this end, Claimants state that the value of the vessel

should be placed at $27,028,548.  To arrive at this figure, their

expert, Mr. Larry Strouse ("Strouse"), took the November 2013

sales price of the Privocean, $28,500,000, and then reduced that

figure based on a total useful life expectancy of 35 years and an

estimated repair cost, due to the incident, of $250,000.[6]

Claimants also note that in November of 2014, the owners of the

Privocean insured the vessel with Nordic / Henschien Insurance at

an estimated value of $30,000,000.  Crescent Ex. 29, 30.  This

further supports Strouse's appraisal.

---

[5] The case of *Alamo Barge Lines, Inc. v. Rim Maritime Co., Ltd.*, 596 F. Supp. 1026, 1033-34 (E.D. La. 1984) is instructive on this point.  In that case, the court took evidence on comparable sales. However, "[b]ecause the market for [the type of vessel] was severely depressed, the [c]ourt . . . question[ed] whether [the] prices actually reflect what a willing buyer and seller would buy and sell for in an ordinary market situation."  *Alamo Barge Lines, Inc.*, 596 F. Supp. at 1034.  Therefore, the court considered items such as, among others, the insured value of the vessel, its cost of replacement and the condition of the vessel.  *Id.; see also In re American Milling Co., Ltd.*, 409 F.3d 1005, 1021-22 (8th Cir. 2005).

[6] While Strouse also provided some data relevant to a "sales comparison approach," he ultimately found the actual sales price of the vessel, after it had been trading for six months, accounting for depreciation and damage, to be the better indicator of value.  Given the dates of the sales of the vessels referenced by Strouse, and the majority of those being sold as new-builds or new-build resales (which are priced on a different basis than a vessel that has been trading), the Court agrees.

The Court finds this testimony persuasive, but it also finds that the drastic decline in the applicable market for charters rates, as testified to by English, cannot be completely disregarded.  Therefore, the Court finds a value of the vessel set at  $23,000,000.00, to be reasonable.[7]  *Standard Oil Co. v. Southern Pac. Co.*, 268 U.S. 146, 156 (1925)("The ascertainment of value is not controlled by artificial rules.  It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts.").  The Court now turns to examine the value of pending freight.

**b. Pending Freight**

The parties do not dispute the charter rate of $7700 / day. They do not dispute that the voyage ended on May 19, 2015. Claimants suggested that the vessel was likely off hire while arrested and thus hire calculations should not include that seventeen day stretch; Privocean however admits that it was only off hire for nine days.  The only dispute then is from when to start counting.

Claimants point to record document evidence showing that the Privocean announced that it was ready to load on April 1, 2015 and argues that the voyage thus commenced that same day. Privocean claims that the charter was prepaid through April 19,

---

[7] This number represents the approximate average of the two numbers suggested by each expert.

2015, and thus there was no pending freight for the voyage until after that point.

"Nor by the use of the word 'pending' was it intended to limit the recovery to the uncollected freight."  *The Main v. Williams*, 152 U.S. 122, 132 (1894)(explaining that the phrase "pending freight" includes all "earnings of the voyage," whether such earnings had been "paid in advance or not"); *In re Uvalde Marine, Inc.*, no. 93-2469, 1994 WL 532661, at *2 (E.D. La. Sept. 27, 1994)(observing that "pending freight is the total earnings for the voyage, both prepaid and uncollected").

The Court finds that the prepaid freight should also be included in the vessel valuation.  Privocean has offered no opposition to the contention that the voyage began on April 1, 2015, when the vessel had finished preparing to load.  The pending freight then extends forty (40) days, from April 1, 2015 to May 19, 2015 (excluding the nine day period from April 20-28). At a rate of $7700 / day, the pending freight is valued at $308,000.

Accordingly;

**IT IS ORDERED** that the limitation fund, representing the fair market value of the M/V PRIVOCEAN and pending freight, **SHALL BE INCREASED** to **$23,308,000.00**.

**IT IS FURTHER ORDERED** that the **Motion to Lift Vessel Arrest (Rec. Doc. 23)** is otherwise **DISMISSED AS MOOT**.

     **IT IS FURTHER ORDERED** that the **Ex Parte Motion for Leave to File a Reply Memorandum (Rec. Doc. 61)** is **GRANTED.**

August 21, 2015

                                              JAY C. ZAINEY
                        UNITED STATES DISTRICT JUDGE