UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| ERGON-ST. JAMES, INC, | * | CIVIL ACTION NO. 15-01121 c/w |
|  | * |  |
|  | * | CIVIL ACTION NO. 15-01137 |
| Plaintiffs | * | and 15-01206 |
|  | * |  |
|  | * | JUDGE ZAINEY |
| VS | * |  |
|  | * | MAGISTRATE KNOWLES |
| M/V PRIVOCEAN | * |  |
|  | * |  |
| Defendant | * |  |
|  | * |  |

**THIS PLEADING PERTAINS TO THE LIMITATION ACTION, CIVIL NO. 15-1206**

<u>**THE *SECOND AMENDED* CLAIM OF CERTAIN UNDERWRITERS AT LLOYD'S LONDON AND ITS MEMBERS SUBSCRIBING TO CONTRACT NO. PE1410633, UNIQUE MARKET REFERENCE BO753PE1410633000, SCOR UK COMPANY LIMITED, TALBOT UNDERWRITING SERVICES (US) LTD., WESTPORT INSURANCE CORPORATION, CERTAIN UNDERWRITERS AT LLOYD'S LONDON (NAVIGATORS), ASPEN SPECIALTY INSURANCE COMPANY, XL INSURANCE AMERICA, INC. AND IRONSHORE SPECIALTY INSURANCE COMPANY**</u>

The Second Amended Claim of Certain Underwriters at Lloyd's, London and its members subscribing to Contract No. PE1410633, Unique Market Reference BO753PE1410633000, SCOR UK COMPANY LIMITED, Talbot Underwriting Services (US) Ltd., (hereinafter referred to as "Insurer Group A") Westport Insurance Corporation, Certain Underwriters of Lloyd's, London (Navigators), Aspen Specialty Insurance Company, XL Insurance America, Inc. and Ironshore Specialty Insurance Company (hereinafter referred to as "Insurer Group B"), **amending "Certain Underwriters at Lloyd's London and its members subscribing to Contract No. PE1410636, Unique Market Reference BO753PE1410633000" to read "Certain Underwriters at Lloyds's London and its members subscribing to**

**Contract No. PE1410633, Unique Market Reference BO753PE1410633000"**, and for their Claim state as follows:

## THE PARTIES, JURISDICTION AND VENUE

1.      At all times pertinent, Certain Interested Underwriters at Lloyd's of London and its Members subscribing to Contract No. PE1410633, Unique Market Reference BO753PE1410633000 ("Lloyd's") were foreign organizations and underwriters of insurance policies.  Lloyd's is comprised of a group of syndicates acting by and through their appointed active underwriters and with its principal place of business located at 1 Lime Street, London, United Kingdom.  At all times described herein, Lloyd's provided a policy of insurance to Ergon, Inc.

2.      At all pertinent times, SCOR UK Company Limited ("SCOR") was a foreign organization and underwriter of insurance policies with its principal place of business located at 10 Lime Street, London, United Kingdom.  At all times described herein, SCOR provided a policy of insurance to Ergon, Inc.

3.      At all times pertinent, Talbot Underwriting Services (US) Ltd. ("Talbot") was a United States Corporation organized under the laws of the State of Delaware with its principal place of business located at 48 Wall Street 17th Floor, New York, New York.  At all times described herein, Talbot provided a policy of insurance to Ergon, Inc.

4.      At all times pertinent, Westport Insurance Corporation ("Westport") was a Missouri corporation with its principal place of business in Overland Park, Kansas and was the insurance risk bearing member of the Industrial Risk Insurers Joint Underwriting Association. At all times described herein, Westport provided a policy of insurance to Ergon, Inc.

5.      At all times pertinent, Certain Underwriters at Lloyd's, London, consisting of Lloyd's Syndicate Navigators; Lloyd's Syndicate Pembroke; and, Lloyd's Syndicate Channel, subscribing to certificate number 14 NSRO 1576-01 ("Navigators") were foreign organizations and underwriters of insurance policies.  At all times described herein, Navigators provided a policy of insurance to Ergon, Inc.

6.      At all times pertinent, Aspen Specialty Insurance Company ("ASPEN") was a Massachusetts company with principal place of business in Rocky Hill, CT Insurance Company ("ASPEN").  At all times described herein, ASPEN provided a policy of insurance to Ergon, Inc.

7.      At all times pertinent, XL Insurance America, Inc. ("XL") was a Delaware corporation with its principal place of business in Stamford, Connecticut. At all times described herein, XL provided a policy of insurance to Ergon, Inc.

8.      At all times pertinent, Ironshore Specialty Insurance Company ("Ironshore") was an Arizona company with its principal place of business in Boston, Massachusetts.  At all times described herein, Ironshore provided a policy of insurance to Ergon, Inc.

9.      At all times pertinent, Ergon, Inc. was a United States Corporation organized under the laws of the State of Mississippi with its principal place of business located in the State of Mississippi.

10.     At all times pertinent, Ergon-St James, Inc., was a United States Corporation organized under the laws of the State of Mississippi with its principal place of business located in the State of Louisiana, and was a subsidiary of Ergon, Inc.

11. At all times pertinent, upon information and belief, Privocean Shipping, Ltd. ("Privocean") was a company organized and existing under the laws of a foreign nation and was the owner of the M/V PRIVOCEAN, with its principal place of business located outside of the United States.

12. At all times pertinent, upon information and belief, Bariba Corporation, ("Bariba") was a company organized and existing under the laws of a foreign nation and was the managing owner of the M/V PRIVOCEAN, manning, victualing and in operational control of said vessel, with its principal place of business located outside of the United States.

13. The M/V PRIVOCEAN is a bulk carrier bearing IMP number 9628087 and flagged under the laws of Malta and home ported in Valetta.

14. Ergon-St James, Inc. sustained monetary damages due to the negligence and/or unseaworthiness and/or fault of Privocean Shipping, Ltd., and/or Bariba Corporation, as owners and managing owners of the M/V PRIVOCEAN, and as a result of the negligence and fault of the M/V PRIVOCEAN, *in rem* during the voyage in question which is the subject of the complaint seeking exoneration from, or limitation of liability in the above referenced matter.

15. Ergon-St. James, Inc. is a subsidiary of Ergon, Inc., who is insured for property damage by Insurer Group A and Insurer Group B.

16. The adjustment of the claim loss remains ongoing, however, to date Insurer Group A and Insurer Group B, in concert with Ergon, Inc.'s other insurance carriers, have paid in excess of $10,000,000.00 USD for damages to the Ergon-St James property.

17. As a result of the negligence by Privocean Shipping, Ltd., and/or Bariba Corporation and as a result of the negligence and fault of the M/V PRIVOCEAN, Insurer Group A and Insurer Group B made and will make payments to their insured Ergon, Inc. on behalf of its subsidiary Ergon-St James, Inc., and are therefore legally, contractually and equitably subrogated to the rights of their insured, and assert all rights of their insured in this action.

18. Federal subject matter jurisdiction exists based upon 28 USC 1331 and 1333.

### I.  THE INSURERS' CLAIM IN LIMITATION

19.  On or about April 3, 2015, the M/V PRIVOCEAN called on the berth of Convent Marine Terminal ("CMT") to carry a cargo of coal in bulk from CMT located in Convent, Louisiana to Rotterdam in the Netherlands.  The M/V PRIVOCEAN was at all material times a bulk carrier, measuring 229 meters in length, 32.3 meters in width, 81,434 metric dead weight tonnage which took on a cargo of coal in bulk of 72,684.26 metric tons loading between April 3, 2015 and April 6, 2015.

20. Upon information and belief M/V PRIVOCEAN's Master expressed safety concerns prior to the subject allision, including the absence of acceptable bollards and high river conditions necessitating the assistance of additional tugs.

21. Upon information and belief, in the days prior to the allision, the vessel's charterer had refused to provide more than one assist tug, stating that the Master would have to bear the cost of any additional assistance himself.  The charterer eventually relented and agreed to pay for two assist tugs in total.

22. The M/V PRIVOCEAN contravened recommended procedures in only using two assist tugs (it only had one up until the day before the allision) rather than the recommended

three or four. It further contravened recommended procedures in using only 14 mooring lines rather than the required 18.

23. The M/V PRIVOCEAN reportedly failed to secure a breast line at the bow of the ship which would have provided increased security and stability.

24. The M/V PRIVOCEAN's engines may not have been engaged at the time of the allision (they may have been turned off). That resulted in a 45 minute delay from the time the M/V PRIVOCEAN drifted from its moorings and before its crew regained control of the vessel.

25. On or about April 6, 2015, the M/T BRAVO, a Malta-flagged, ocean going oil tanker vessel was being unloaded of its crude oil cargo while moored at the St. James Terminal located in St. James, Louisiana.

26. While being unloaded the M/T BRAVO was secured by at least 16 mooring lines and two assisting tug boats, namely the M/V SHELBY FRIEDERICHS and M/V ANDREW JACKSON both owned by Crescent Towing.

27. At approximately 1600 hours on April 6, 2015, the M/V PRIVOCEAN broke away from CMT and fell down river toward the Ergon-St. James dock.

28. At the time of the breakaway of the M/V PRIVOCEAN from CMT located on the left descending bank of the Mississippi River, the M/V BRAVO was located on the right descending bank of the river at St. James, Louisiana at the Ergon-St. James dock where it was in the process of an oil cargo transfer.

29. The M/V PRIVOCEAN fell to port and struck the M/V BRAVO. The M/V PRIVOCEAN broke away from the CMT dock as a result of negligence, unseaworthiness and other fault of the M/V PRIVOCEAN, her owner, master, operators and charterers in:

      a.      Failing to properly tend the ship's mooring lines;

      b.      Failing to use the proper number of mooring lines;

      c.      Failing to deploy any forward breast lines;

      d.      Failing to use the proper number of tugs to secure the vessel;

      e.      Failing to properly secure the ship's mooring lines to the ship's bits and winches which allowed the mooring lines to unexpectedly pay out;

      f.      Failing to properly maintain the ship's lines and replace any lines which were less than 40% of their breaking strength when new;

      g.      Failing to maintain the engines at the ready;

      h.      Other acts and/or omissions of negligence, unseaworthiness, and/or fault as may be revealed in discovery and proven at trial.

30. The M/V PRIVOCEAN accepted the CMT berth within the meaning of *Bunge Corp. M/V FURNACE BRIDGE*, 558 F.2d 796 (5th Cir. 1977), *cert denied*, 98 S.Ct. 1488 (1978). The M/V PRIVOCEAN's master issued notes of protest concerning the safety of the berth and despite issuance of such notes of protest, the master of the M/V PRIVOCEAN failed to keep its engines in a ready position which would have allowed the M/V PRIVOCEAN to avoid any collision whatsoever despite the breakaway. Furthermore, those in charge of the navigation of the M/V PRIVOCEAN were in the process of sending emails as the ship was breaking away from its berth instead of attempting to navigate the ship in an effort to maneuver it away from the M/V BRAVO and/or the Ergon St. James facility.

31. The owners and operators of the M/V PRIVOCEAN are not entitled to limit their liability to the value of the vessel plus pending freight because the owners and operators of the vessel were privy to and had knowledge of the cause of the casualty, prior to the breakaway.

32. The Ergon St. James facility suffered extensive damage as a result of the M/V PRIVOCEAN's allision with the M/V BRAVO and the Ergon St. James facility dock structure. Additional damages include extra expense incurred in its efforts to mitigate its business interruption losses.  Pursuant to their controlling policies of insurance, Insurer Group A and Insurer Group B made and will make payments to their insured Ergon, Inc. on behalf of its subsidiary Ergon-St James, Inc., and are therefore legally, contractually and equitably subrogated to the rights of their insured, and assert all rights of their insured in this action.

## II.  SERVICE UPON PLAINTIFFS' IN LIMITATION'S COUNSEL SUFFICIENT PURSUANT TO LOUISIANA NON-RESIDENT WATERCRAFT ACT

33. Insurer Group A and Insurer Group B incorporate paragraphs 1 through 32 as though fully stated herein.

34. Bariba Corp. and Privocean Shipping Ltd. operated a deep draft bulk carrier in the territorial waters of the State of Louisiana.

35. As provided for by the provisions of Louisiana's Non-Resident Watercraft Act, LSA-R.S.13:3480, Privocean Shipping Ltd. and Bariba Corp. have appointed the Louisiana Secretary of State as their agent for service of process for litigation arising from the allision incident described herein.  They are able to do so as it is a claim for negligence arising out of the operation of a vessel flying a foreign flag in Louisiana state waters.  Moreover, Privocean Shipping Ltd. and Bariba Corp. have sought affirmative relief and protection pursuant to the U.S. Federal Limitation of Liability Act in the United States District Court for the Eastern District of Louisiana and accordingly each has waived any defenses to *in personam* jurisdiction and/or the specific requirements of service upon the Louisiana Secretary of State.  Accordingly, service can effect by electronic delivery of this claim to their counsel of record herein.

### III.  DIRECT ACTION

36. Insurer Group A and Insurer Group B incorporate paragraphs 1 through 35 as though fully stated herein.

37. The M/V PRIVOCEAN is insured with Gard P&I (BERMUDA) Ltd. ("Gard") which provides it with liability coverage.  Gard, as liability carrier, has appointed the Secretary of State as its agent for service of process and is subject to suit pursuant to Louisiana's Direct Action Statute, LSA-R.S. 22:655.

38. Pursuant to the Louisiana Direct Action Statute, even if the value of the M/V PRIVOCEAN is less than $30 million, claimants are entitled to recovery from Gard in the amount of the agreed insured value of the vessel which is $30 million in accordance with Clauses 18-13 of the Nordic Marine Insurance Plan of 2013.

39. Privocean Shipping Ltd., Bariba Corp., M/V PRIVOCEAN *in rem*, and Gard are jointly and severally liable for all damages sustained by claimants without limitation of any type, kind or nature and without any insurance limits up to the value of the losses sustained.

WHEREFORE, Certain Underwriters at Lloyd's, London and its members subscribing to Contract No. PE1410633, Unique Market Reference BO753PE1410633000, SCOR UK COMPANY LIMITED and Talbot Underwriting Services (US) Ltd., Westport Insurance Corporation, Certain Underwriters of Lloyd's, London (Navigators), Aspen Specialty Insurance Company, XL Insurance America, Inc. and Ironshore Specialty Insurance Company pray that their Second Amended Claim be deemed good and sufficient and after due proceedings, that there be judgment against Petitioners in their favor:

1. Increasing security required from Petitioners to the amount of the claims against them;

2. Denying limitation of Petitioners' liability in all respects;

3. For a judgment against Privocean Shipping Ltd., Bariba Corporation, M/V PRIVOCEAN, *in rem*, and Gard P&I (BERMUDA) Ltd. jointly, severally and *in solido* for all losses and damages sustained.

Respectfully submitted:

/s/ Charles E. Riley, IV
Charles E. Riley, IV (28200)
David F. Bienvenu, T.A. (3070)
Simon, Peragine, Smith & Redfearn, LLP
1100 Poydras Street, Suite 3000
New Orleans, Louisiana 70163
(504) 569-2030
(504) 569-2999 (Facsimile)
criley@spsr-law.com
davidb@spsr-law.com
Attorneys for Certain Underwriters at Lloyd's, London and its members subscribing to Contract No. PE1410633, Unique Market Reference BO753PE1410633000, SCOR UK COMPANY LIMITED and Talbot Underwriting Services (US) Ltd., Westport Insurance Corporation, Certain Underwriters of Lloyd's, London (Navigators), Aspen Specialty Insurance Company, XL Insurance America, Inc. and Ironshore Specialty Insurance Company

**CERTIFICATE OF SERVICE**

I hereby certify that on April 6th, 2016, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all persons electronically noticed. I further certify that I mailed the foregoing document and the

notice of electronic filing by placing same in the United States mail, postage prepaid and properly addressed, to any non-CM/ECF participants.

                                                /s/Charles E. Riley, IV