UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ERGON-ST. JAMES, INC. | CIVIL ACTION |
| VERSUS | NO. 15-1121 C/W 15-1137 & 15-1206 |
| M/V PRIVOCEAN, et al. | JUDGE JAY C. ZAINEY |
| | MAGISTRATE JUDGE DANIEL E. KNOWLES, III |

*Applies to All Cases*

**ERGON'S PRE-TRIAL MEMORANDUM**

Ergon - St. James, Inc., Ergon, Inc., Ergon Refining, Inc., and Magnolia Marine Transport Co., (collectively at times "Ergon") and their Underwriters[1] submit the following Pre-Trial Memorandum pursuant to the Court's order [R. Doc. 410].

1. **Leading Up to the April 6, 2015 Incident**

The PRIVOCEAN arrived at CMT on April 4, 2015 in order to load a cargo of coal. The RIVOCEAN is owned by Privocean Shipping, Ltd. and is operated by Bariba Corp. (collectively, with the PRIVOCEAN, "Privocean Interests"). Cargill was a sub-time charterer of the M/V PRIVOCEAN. In April 2015, the CMT dock was owned and operated by Raven. Tug boats owned and operated by Crescent Towing & Salvage Co., Inc. ("Crescent") were hired to assist the PRIVOCEAN during its docking and shifting maneuvers and to provide "hold-in" assistance to the PRIVOCEAN during cargo operations. Indisputably, Ergon had absolutely nothing to do with anything that happened at the CMT dock prior to the PRIVOCEAN's breakaway, including its mooring, its cargo operations or its decision to utilize "hold-in" tugs.[2]

---

[1] Certain Interested Underwriters at Lloyd's of London and PartnerRE Ireland Insurance.
[2] On April 6, 2015, the BRAVO was securely moored at the Ergon dock. The BRAVO was also assisted by two Crescent "hold-in" tugs. At the time of the allision, the BRAVO had discharged its cargo of crude oil and was

Prior to, during, and after the mooring at the CMT dock, Privocean Interests expressed and were made well aware of concerns with the PRIVOCEAN's mooring situation at the CMT dock. The Master of the PRIVOCEAN will testify that when the PRIVOCEAN was brought into the berth, the Pilot recommended using sixteen (16) mooring lines. However, the inexperienced Master, who was ignorant of the high river situation and the current, used only fourteen (14) lines, even though the PRIVOCEAN actually had twenty-two (22) lines on board.

According to the Master, the Chief Officer ("CO") is responsible for making sure that the vessel was properly moored. Yet, the CO will testify that the crew did not hold any meeting regarding the vessel's mooring plan and that he had no discussions with the Master regarding how the vessel was going to be tied up at its berth. There were also no separate discussions or written mooring plans prior to the vessel's berthing, even though Bariba requires a written mooring plan for all berthings. In fact, the CO had absolutely no training on Bariba's policies and procedures with respect to the mooring of the PRIVOCEAN.

The Master and CO's testimony establishes that the Master and crew of the PRIVOCEAN directly violated Bariba's policies and procedures regarding safely mooring the vessel; these policies and procedures rely on the Master to make determinations as to the proper and safe mooring of the vessel, to establish and discuss a mooring plan prior to berthing and to have discussions with the crew of the PRIVOCEAN regarding how the vessel is to be moored. None of this was done.

The day before the PRIVOCEAN broke away, April 5, 2015, the Master issued a Notice of Protest ("NOP") to the charterers. The NOP addressed a number of issues including the lack of proper mooring and the lack of necessary tugs alongside the vessel. The Master emailed the

---

crude oil washing. There were no problems or abnormalities with the operation involving the BRAVO at the Ergon dock prior to the breakaway of the PRIVOCEAN and its subsequent allision with the BRAVO and the Ergon dock.

NOP to all Bariba personnel, including Bariba's Chartering department and the General Manager of Bariba, the second-highest ranked person in Bariba behind the Managing Director.

After sending the NOP, the Master had telephone conversations with three (3) different Bariba employees about the NOP. Despite knowledge of the issues with the vessel's mooring, no one at Bariba told the Master: (1) to vacate or move the vessel from its berth; (2) to provide additional mooring lines; (3) to order more assist tugs; (4) to drop the vessel's anchor(s); (5) to notify the charterers or terminal about these issues; (6) to station a crewmember on the deck to monitor the mooring lines; or (7) to request a Pilot to remain onboard at all times. In the days leading up to the breakaway, including the day off, the PRIVOCEAN sent and received hundreds of emails. Yet, the PRIVOCEAN never received a single email from its management with further instructions on addressing what the Master considered to be an unsafe situation.[3]

On April 6, 2015, before the breakaway, the Master had a telephone conversation with Bariba's General Manager. In this conversation, the Master referred to the entire berthing as an "ordeal" and noted that the PRIVOCEAN had been placed at a very bad spot in the River because of the high river and the current being strong. The Master claimed that "the ship won't stand here." The Master also noted that the vessel on the other side of the River (the M/T BRAVO, moored at Ergon's dock) was "at a more convenient location than we are" and had two (2) tugs assisting it and holding it to its berth. The Master even took a picture of the BRAVO and sent it to his superiors in Greece. Nonetheless, the Master will testify that he did not receive any orders or instructions from Bariba's General Manager during this conversation either.

The Master was never asked to perform a risk assessment per Bariba policies and procedures. In fact, the Master will testify that even though Bariba's policies permit him to

---

[3] Remarkably, the Master will testify that he did not receive any emails, orders, instructions or other communication from Privocean Interests after the accident regarding the accident or any investigation of the matter.

make all final decisions about the safe operation of the vessel, he did not believe that his vessel -- which was inadequately moored and lacked the necessary tug support -- remaining at a berth he considered unsafe to be an "emergency" situation.

### 2. The Breakaway and Aftermath

Around 1545 hours on April 6, 2015, the PRIVOCEAN broke free from its moorings. The PRIVOCEAN drifted across the River without any motive power. It slammed against the BRAVO during crude oil washing operations. The evidence will show that the PRIVOCEAN then laid on the BRAVO for a number of minutes while neither vessel was anchored.

The BRAVO then began moving down the Ergon dock, at which point Ergon first became aware of the situation. The BRAVO's mooring lines broke, and the BRAVO continued to move down the Ergon dock. The BRAVO's mooring lines broke as a result of the allision by the M/V PRIVOCEAN and its continual presence alongside the BRAVO during the incident. All the while, the M/V PRIVOCEAN continued to stay in contact with the BRAVO, putting pressure on it and the Ergon dock.

In response to the movement of the BRAVO and the breaking of its lines, and in an effort to protect life and the environment, Ergon Dock Operator Kevin Labat ("Labat") called over the marine radio for assistance with keeping the BRAVO alongside the dock, which was provided by the Tug BECKY S., operated by Bisso Towboat, and the tug ELIZABETH B., operated by E.N. Bisso. Labat, however, could not see where they were or what they were doing and feared the BRAVO would cause a massive oil spill.

During this entire time, the PRIVOCEAN was attempting to maneuver upriver and away from the M/T BRAVO and Ergon dock. The evidence and testimony put on by Ergon and its underwriters will clearly show that the PRIVOCEAN eventually got its engines up to power, and

begins maneuvering in an attempt to clear the BRAVO and the Ergon dock and move upriver. In doing so, the PRIVOCEAN pushed her stern into and against the bow of the BRAVO, causing the BRAVO to crash through Ergon's dock. The force of the PRIVOCEAN drove the BRAVO through Ergon's ship dock and onto its barge dock as well. While moving upriver, the PRIVOCEAN also snagged Ergon's loading arm.

Trent Taylor -- the Captain of the Tug BECKY S, one of the tugs that came to help while the PRIVOCEAN was laying alongside the BRAVO and Ergon's dock for nearly thirty (30) minutes -- will testify that his tug and the other assist tug did not push the BRAVO through Ergon's dock, contrary to the argument of Privocean Interests. In fact, Taylor will testify that his tugs have never pushed a tanker through a dock, even when pushing at "full ahead."

Simply put, the PRIVOCEAN is entirely responsible for the damage at Ergon's dock and the undisputed evidence at trial will show this.[4] Privocean Interest's liability will be clearly established at trial. After all, it is not like Ergon's dock "jumped out" in front of the PRIVOCEAN. What will also be clearly established at trial is that the PRIVOCEAN's movements, and the force it exerted while trying to get upriver, not only caused the initial damage to the Ergon dock, but also drove the BRAVO through the Ergon dock, causing significantly more damage. Then, to cap off its whirlwind of damage, the PRIVOCEAN destroyed Ergon's loading arm while heading upriver.

What happened with the various vessels -- including the fact that the PRIVOCEAN drove the BRAVO through Ergon's dock -- is undisputed and will be undisputed at trial because Privocean Interests have no witness or expert that can testify as to what the various vessels were

---

[4] Privocean Interests have filed a Limitation action. The negligence of Privocean Interests and the unseaworthiness of the PRIVOCEAN will be clearly established. Moreover, the "privity and knowledge" component will likewise be established. Privocean Interests will not be able to carry their burden in establishing their Limitation claim.

doing at any particular time. Privocean Interests have no expert that opine regarding the vessels' movements; they have no expert that can opine as to whether the PRIVOCEAN's actions were appropriate; they have no expert that can opine as to Ergon's terminal operations or whether actions taken by Ergon or any other party were reasonable; they have no expert that can properly explain and analyze the VDR information or videos from the Ergon dock and the BRAVO, both of which clearly show the PRIVOCEAN pushing the BRAVO through Ergon's dock.

Any suggestion that the PRIVOCEAN did not push the BRAVO through Ergon's dock will be belied by the complete lack of evidence supporting this contention at trial.

### 3. Emergency Situation

This was clearly an emergency situation. The PRIVOCEAN broke away from its mooring; it drifted across the Mississippi River without any motive power; it slammed against the BRAVO during crude oil washing operations; it then laid on the BRAVO for a number of minutes while neither vessel was anchored; the BRAVO began moving down the Ergon dock, at which point Ergon first became aware of the situation; the BRAVO's mooring lines broke, and the BRAVO continued to move down the Ergon dock; all the while, the PRIVOCEAN continued to stay in contact with the BRAVO, putting pressure on it and the Ergon dock; tugs arrived on scene but Kevin Labat could not see where they were or what they were doing and feared the BRAVO would cause a massive oil spill; and finally, the BRAVO, which was now free of its moorings and had no anchor down, was subsequently pushed through Ergon's dock by the movements and force of the PRIVOCEAN as it was trying to get under control and move upriver. If this is not an emergency situation, then nothing qualifies as an emergency situation.

Ergon personnel will testify that they considered it an emergency; PRIVOCEAN's Master will testify that he considered the entire situation to be a "domino of emergencies";

Bariba's Designated Person Ashore will testify that he considered it an emergency; PRIVOCEAN's Third Officer will testify that he considered it an emergency. Trent Taylor, the Captain of the Tug BECKY S, will testify that the BRAVO never stopped falling backwards as a result of the allision, despite the efforts of the BECKY S and the ELIZABETH B. Taylor will also testify that the PRIVOCEAN was never under control and steady. This entire situation was "nerve-wracking." Privocean Interests' own expert will also admit that the entire event was an emergency situation. No one who was involved in this incident testified that it ever ceased being an emergency until the PRIVOCEAN was well-clear of the BRAVO and anchored upriver.

The suggestion that this was not an emergency situation will also be belied by the complete lack of evidence supporting this contention at trial.

### 4. Presumptions and *In Extremis*

Under well-settled United States Supreme Court precedent, Privocean Interests are presumed to be at fault for the allision of the PRIVOCEAN with the moored BRAVO and the stationary Ergon dock.[5] The fact that the PRIVOCEAN broke free of its moorings and allided with a moored vessel, the M/T BRAVO, and a stationary object, the Ergon dock, creates a presumption under *The Oregon* Rule that the PRIVOCEAN is at fault. At trial, Ergon will meet its initial burden of demonstrating the breach of a duty on the part of the PRIVOCEAN by merely invoking *The Oregon* Rule. As a result, the burden of proof will shift to Privocean Interests.

*The Louisiana* Rule will also hinder any attempt by Privocean Interests to argue contributory liability. This presumption of negligence is based on the logical deduction that a

---

[5] *The Oregon*, 158 U.S. 186, 192-93 (1895); *The Louisiana,* 70 U.S. 164, 173 (1865); *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874).

drifting vessel was mishandled or improperly moored.[6] It applies, as is the case here, when a vessel breaks free from its moorings and allides with a stationary object.[7] Like *The Oregon* Rule, *The Louisiana* Rule "operates to shift the burden of proof-both the burden of producing evidence and the burden of persuasion-onto the moving ship."[8] Privocean Interests will not be able to prove that the allision was the BRAVO's fault or Ergon's fault. Nor will Privocean Interests be able to prove that they acted reasonably in not using additional mooring lines or assist tugs at its berth.

Lastly, *The Pennsylvania* Rule will apply as a result of the Master and crewmembers' failure to exercise the reasonable care and violations of a host of regulations, statutes and Rules of the Road.

Moreover, it will clearly be established that this was an *in extremis* situation. Under General Maritime Law, when the fault of a ship puts another party into a situation of *in extremis*, "any error in judgment at that time…cannot be imputed as a fault" to the non-vessel party.[9] The doctrine is applicable when the party asserting it was "free from fault until the emergency arose."[10] "The rule is founded upon the sound principle that 'a ship has no right to put another [party] into a situation of extreme peril, and then charge that other [party] with misconduct.'"[11] "Courts are not supposed to second guess parties in peril and expect from them the most precise judgments. Decisions under perilous conditions are expected to be and are naturally more reflexive that reflective."[12] The testimony offered by the various fact witnesses above will establish that this was an emergency situation; further, the testimony and evidence offered at trial

---

[6] *James*, 686 F.2d at 1132-33.
[7] *Signal Int'l LLC v, Miss. DOT,* 579 F.3d 478, 490 n.11 (5th Cir. 2009).
[8] *Delta Transload, Inc. v. M/V Navios*, 818 F. 2d 445, 449 (5th Cir. 1987).
[9] *The Blue Jacket,* 144 U.S. 371 (1892). ); *see also The Benefactor,* 102 U.S. 214, 217-18 (1880).
[10] *Bucolo, Inc. v. S/V Jaguar,* 428 F.2d 394 (1st Cir. 1970).
[11] *Union Oil Co. of Cal. v. Tug Mary Malloy,* 414 F.2d 669, 674 (5th Cir. 1969); *see also The Oregon,* 158 U.S. at 812.
[12] *Id.*

will establish that Ergon was "free from fault when the emergency arose" and that Privocean Interests has no "right to put [Ergon] into a situation of extreme peril, and then charge [Ergon] with misconduct."[13]

Even assuming there was a miscommunication of Ergon's wishes, General Maritime Law requires something more than a "mere mistake of judgment."[14] Kevin Labat will testify that his concerns were to protect life and the environment. Any "mere mistake of judgment" does not impute comparative fault to Ergon. Tellingly, Privocean Interests will not be able to establish at trial what specific duty was owed by Labat or how that duty was breached. Labat is not a mariner; he was not responsible for the navigation of the PRIVOCEAN, the BRAVO, the BECKY S or the ELIZABETH B. Any allegations of fault with respect to the navigation of any vessel are clearly misplaced because the standard of care owed by a seaman is not the same as the standard of care owed by an ordinary person.

### 5. Ergon's Damages

Ergon will offer testimony from its project manager, terminal operator, experts and claims adjuster to establish the extent of its damages claim. Ergon will submit thousands of pages of exhibits -- all of which are unobjected to -- identifying its property damage and business interruption/incidental damage claims in full. To effectuate the necessary repairs and reconstruction as a result of the incident, Ergon hired a number of companies to repair its dock. Ergon personnel, with the assistance of Lanier & Associates Consulting Engineers, Inc. ("Lanier"), oversaw all aspects of the repair work. The evidence and testimony will establish extent of damage and the scope of repairs undertaken by Ergon. The evidence and testimony

---

[13] *Bucolo, Inc. v. S/V Jaguar,* 428 F.2d 394 (1st Cir. 1970); *Tug Mary Malloy, supra.*
[14] *Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.*, 866 F.2d 752, 771 (5th Cir. 1989) (quoting *Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81, 84 (5th Cir. 1960)).

will also establish that all the repair and reconstruction costs incurred by Ergon are reasonable and customary.

To mitigate damages, Ergon coordinated with another terminal for offloading at its facility while the Ergon dock remained inoperable. Ergon incurred costs totaling $250,000 for vessel berthing at this facility. Ergon also had to charter vessels and barges from Magnolia Marine Transport Co. to assist with the offloading of these vessels. These costs were all incurred as a direct result of the incident.

The testimony and evidence will establish that Ergon's property damage claim totals $12,338,160.21. The evidence will establish that Ergon's business interruption/incidental damage claim totals $2,159,843.13. In addition, the testimony and evidence will establish that Ergon has additional uninsured damages totaling $650,000. Ergon is also entitled to significant pre-judgment interest that totals nearly $1 million.

The testimony and evidence will also establish that Ergon's property damage claim should not be depreciated or reduced. Lanier's testimony and the corresponding evidence will establish that Ergon's repairs and reconstruction did not extend the useful life of the property. Ergon's existing structures were robust, were not heavily used, and were very well maintained, including being recoated in 2013. With respect to betterment, Privocean Interests ignore the fact that, by code, Ergon had to rebuild structures certain ways. Privocean Interests' argument regarding depreciation relies upon an arbitrary depreciation percentage applied incorrectly and uniformly to all structures and ignores the fact that Ergon's facility was well-maintained.

*   *   *   *   *

The testimony and evidence offered by Ergon and its underwriters will prove Privocean Interests' negligence and Ergon's entitlement to a Judgment totaling more than $14,600,000.

Respectfully submitted,

*/s/ Hansford P. Wogan*

C. BARRETT RICE (#30034)
JEFFERSON R. TILLERY (#17831)
HANSFORD P. WOGAN (#34825)
CATHERINE C. DARDEN (#35090)
JONES WALKER LLP
201 St. Charles Avenue - 48th Floor
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8238
Facsimile: (504) 589-8238
E-Mail: brice@joneswalker.com
jtillery@joneswalker.com
kdarden@joneswalker.com
fwogan@joneswalker.com

*Attorneys for, Ergon - St. James, Inc., Ergon, Inc., Ergon Refining, Inc., Magnolia Marine Transport Co. and Certain Underwriters subscribing to Lockdon London Contract Nos. PE 1410635, PE1410636, PE1410633 and PEE 1410695 including Lloyd's Syndicates 435, 1967, 318, 510, 1225, 33, 2623, 623, 1969, 2001 and 1200 and PartnerRe Ireland Insurance.*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above has been sent to opposing counsel, via CM/ECF electronic filing, via facsimile, via e-mail and/or by placing a copy of same in the U.S. mail, properly addressed, postage prepaid, this 20th day of April, 2018.

*/s/ Hansford P. Wogan*
HANSFORD P. WOGAN