# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

ERGON-ST. JAMES, INC.

VERSUS

M/V PRIVOCEAN, et al.

CIVIL ACTION NO.  15-1121 C/W
15-1137 & 15-1206

JUDGE JAY C. ZAINEY

MAGISTRATE JUDGE DANIEL E.
KNOWLES, III

*Applies to All Cases*

## PETITIONERS' PRETRIAL MEMORANDUM

A casualty of this type and magnitude cannot happen unless multiple parties are at fault. Petitioners, Crescent, Raven, Cargill, the various personal injury claimants, and certain of Ergon's insurers have already recognized this undeniable reality by entering into amicable settlements to resolve their disputes.

Of the 17 claims filed against Petitioners in these consolidated proceedings, 16 ½ have been settled.  Of the three third party claims made by Petitioners against other parties, all three have also settled.

Thus, the only dispute that remains in this case is between Petitioners and Ergon (and Ergon's remaining non-settling insurers).  Before trial, Petitioners hope to reach agreement with Ergon and its remaining insurers on a stipulation as to certain aspects of both liability and damages This should further reduce the issues for the Court to resolve at trial.  These will include (i) whether the acts and omissions of Ergon's dock operator Kevin Labat exacerbated, increased, and/or contributed to the damage to the downriver section of Ergon's dock and to the BRAVO's port side bilge keel; (ii) whether Ergon's damage claim should be reduced to account for depreciation, betterment of its facility, and Ergon's own fault in causing or contributing to those damages, and

- 1 -

(iii) whether Ergon is entitled to interest on any damage award and, if so, in what amount.  Beyond those narrow issues, Petitioners do not contest that they will be liable to Ergon for some amount of damages—rather, the remaining disputes concern the extent of that liability.[1]

## 1.       The Breakaway

PRIVOCEAN is a large bulk carrier built in 2013.  At the time of this incident, she was only two years old, was well-maintained, and her officers and crew all were properly licensed and certificated.  PRIVOCEAN's immediate prior voyage was uneventful and involved a cargo of urea lifted in China and discharged at the St. James mid-stream mooring buoys in the Mississippi River.  After completion of discharge and hold cleaning, PRIVOCEAN proceeded under charterer Cargill's orders to the Raven berth (a/k/a/the Convent Marine Terminal, or "CMT"), arriving on April 4, 2015 at about 1630 hours.  At 1550 hours on April 6, 2015, PRIVOCEAN's bow began to come off the CMT dock and swing to port (left), into the river.  After completely breaking away from the CMT dock at about 1555 hours, PRIVOCEAN was swept sideways across the river into the moored tanker BRAVO at the Ergon wharf.

## 2.       The Allision Between the PRIVOCEAN and the BRAVO

At about 1600 hours (4:00 pm) on April 6, PRIVOCEAN contacted BRAVO, in way of BRAVO's starboard bow.  In particular, the tug TEXAS on PRIVOCEAN's port bow was the actual point of initial contact between PRIVOCEAN and BRAVO.  The impact pushed BRAVO hard against the upriver section and corner of the Ergon dock center main fendered wharf face,

---

[1] As the Court knows, Ergon and its various insurers split Ergon's claim and filed two separate claims against Petitioners in this limitation action.  *See* Rec. Docs. 101 & 112.  Petitioners have recently settled one of those claims, that being the one asserted by the Ergon insurers which hold 45.5% of the subrogated property damage claim by Ergon.  *See* Rec. Doc. 112.  Thus, the claim to be tried is for 54.5% of the subrogated Ergon property damage claim plus the amount of Ergon's uninsured losses (deductible) of about $650,000.  The Court's final judgment should of course reflect that 45.5% of Ergon's subrogated damage claim has been settled.

causing damage to this area of the Ergon dock and to BRAVO's port side *above the waterline*, just forward of amidships.

When BRAVO recoiled off the Ergon fenders, two of her forward bow lines parted, but two held, and BRAVO remained moored as before.  PRIVOCEAN continued forward and upriver about a ship length, pulling TEXAS clear of BRAVO's starboard bow, then nosing into the river bottom and dropping her starboard anchor at about 1602 hours.  PRIVOCEAN, BRAVO, and TEXAS all remained in the same position from about 1602 hours until about 1607 hours.

At that time, PRIVOCEAN's captain decided to heave anchor and turn to port to try to free BRAVO's bow hold-in tug SHELBY, wedged between PRIVOCEAN and BRAVO.  This port turn effort between about 1607 hours and 1610 hours was successful in freeing SHELBY, but unfortunately resulted in damage to the Ergon ship dock's most upriver mooring dolphin MD-1; and also caused BRAVO's two remaining headlines to part.  As a result, BRAVO for the first time began to slowly drift downriver, but with PRIVOCEAN resting alongside BRAVO as PRIVOCEAN's captain intended, keeping BRAVO from drifting out into the river.

Ergon's dockman Kevin Labat noticed BRAVO slowly drifting downriver along the Ergon dock main wharf face.  At about 1610:40 hours he called to the Crescent tugs:  "Hey Tugs: This is the Ergon Dock, ship is starting to move back and we still got our loading arm hooked up."  There was no answer, apparently because the Crescent tugs were fully engaged with TEXAS and their own situations.

At 1624 hours, the Ergon marine loading arm pipeline disconnected from BRAVO, and she only had a few remaining mooring lines intact.  The BRAVO CCTV camera records the disconnection and the slow toppling of the Ergon marine loading arm.  This was the only additional damage to the Ergon wharf or to BRAVO since about 1609 hours.  Nevertheless, BRAVO did not

drift out into the river because PRIVOCEAN's captain was carefully maneuvering to keep PRIVOCEAN resting alongside BRAVO so she would stay alongside the Ergon dock.

**3.      Ergon's Intervening / Superseding Fault**

At 1626 hours, almost a full half hour after the initial allision, Ergon's dockman Labat became concerned that BRAVO might drift downriver below the Ergon main wharf face fendered area.  By now, "Good Samaritan" tugs BECKY S and ELIZABETH B were in the area.  Ergon's dockman ordered those tugs to come alongside BRAVO, and then to push on her starboard.  Since BRAVO was made up port side to the Ergon ship dock, this had the effect of pushing the BRAVO into and, ultimately, over, the ship dock and into the Ergon barge dock located well toward the shore.

Meanwhile, PRIVOCEAN's captain observed that he had been relieved by BECKY S and ELIZABETH B.  Accordingly, he began maneuvering PRIVOCEAN upriver to clear BRAVO and the Ergon dock.  The PRIVOCEAN captain's efforts had been successful, as from 1602 hours to about 1630 hours there had been no further hull side shell damage to BRAVO, and only relatively minor damage to the Ergon marine loading arm and BRAVO's cargo manifold.  Even more importantly, the Crescent tug crews were safe.  Tugs SHELBY and TEXAS were now free and en route to a nearby staging area for crew relief and medical treatment.

But as PRIVOCEAN moved upriver, the BECKY S and ELIZABETH B with more than 8,000 horsepower combined kept pushing BRAVO toward the west bank and against the Ergon dock downriver mooring dolphin MD-4 and its associated bents and catwalks extending downriver from the main wharf face.  As a result, the mooring dolphin MD-4 began to topple as the two tugs, obedient to the Ergon dockman's ongoing command, pushed empty BRAVO right over the top of MD-4.  But rather than countermand his order, and tell the tugs to stop pushing or push less, the

- 4 -

Ergon dockman, Kevin Labat, stopped to take photos of the gradually worsening situation. Eventually, BRAVO was pushed by the two tugs completely over MD-4, which was utterly destroyed, but not before causing substantial physical damage to the bottom edge port bilge keel of BRAVO's hull.  This bottom edge damage would not have happened had Labat not ordered to push BRAVO laterally, toward the west bank, so hard that the vessel was literally pushed over the ship dock structure.

At this point, Ergon's dockman surely should have recognized he was destroying his own wharf.  Ergon's CCTV camera recording demonstrates PRIVOVCEAN was no longer in contact with BRAVO.  Indeed, BRAVO even drops her starboard anchor, but the Ergon dockman still did not countermand his order.  The two tugs continued pushing hard, and BRAVO now continued slowly moving laterally more than 300 feet and next began to topple the Ergon barge dock tripod dolphin.  The Ergon dockman never countermanded his order, and the two tugs kept pushing hard, grinding BRAVO against the Ergon barge dock (damaging the gangway) and the underwater destroyed wharf debris for another hour, until a ship pilot finally arrived and told the tugs to stop pushing and just lay alongside.  The Ergon dockman's actions and inactions were clearly negligent and exacerbated the damage to Ergon's dock and to the BRAVO.

As Petitioners explained in their opposition to Ergon's motion for partial summary judgment, *see* Rec. Doc. 355, Ergon cannot rely on the "exigent circumstances" or *in extremis* doctrine to minimize its land-based culpability.  As the Fifth Circuit has explained, the *in extremis* doctrine "is founded upon the sound principle that a ship has no right to put another ship into a situation of extreme peril, and then charge that other ship with misconduct."  *Union Oil Co. of Cal. v. Tug Mary Malloy*, 414 F.2d 669, 674 (5th Cir. 1969) (emphasis added).  Thus, the doctrine has no applicability whatsoever to Ergon's land-based negligence.

Even if the Court were to conclude that the *in extremis* doctrine can apply to land-based negligence, the doctrine should not be applied here given the slow-developing nature of this casualty, and even if the doctrine was triggered, it cannot remain in effect through the full duration of the event during which Labat failed to call off the Good Samaritan tugs after it became apparent that they were pushing the BRAVO laterally into and over Ergon's ship dock and all the way into the relatively distant barge dock.

The evidence will show that Ergon did not properly train its dockmen and had no drills or response plans for a ship breakaway. Moreover, after 3-4 minutes to gather wits, those affected by an emergency are supposed to start making sensible decisions—or be held liable if they do not. *See, e.g., Crescent Towing & Salvage Co. v. CHIOS BEAUTY MV*, 610 F.3d 263, 268 (5th Cir. 2010) ("[T]he *in extremis* standard of care should not be applied to the actions of a captain who had ample time to avoid the peril.").

For example, the Sixth Circuit held that the master of a vessel who had only <u>four minutes</u> to assess a situation was nevertheless negligent because he could have avoided an allision with a drawbridge by dropping anchor during that window of time. *See Grosse Ile Bridge Co. v. Am. S.S. Co.*, 302 F.3d 616, 625-26 (6th Cir. 2002) ("[W]e conclude that Captain Gapczynski's decision to delay the dropping of the anchor constituted negligence even under the *in extremis* doctrine."). Similarly, Judge Wright of this Court refused to apply the *in extremis* doctrine during the "three or four minutes before [a] collision occurred" involving a tug and tanker in the Mississippi River. *See Compania De Navegacion Cristobal, S.A. v. The Lisa R.*, 112 F. Supp. 501, 503 (E.D. La. 1953); *see also In re Magnolia Marine Transp. Co.*, 59 F.3d 1240, 1995 WL 413005, at *5 (5th Cir. 1995) ("The district court's underlying factual conclusion that the POINTE COUPEE had more than five minutes in which to do something to avoid collision has not been shown to be

clearly erroneous and the legal conclusion which necessarily flows from it is that the POINTE

COUPEE was not in 'sudden peril through no fault of her own' which would entitle her to invoke

the *in extremis* doctrine.").[2]

Here, Ergon's dockman had more than ample time to countermand his order to the tugs to

push on BRAVO. But he did not, he just kept walking around taking photographs. As a result of

the Ergon dockman's lack of training and negligent conduct, Ergon needlessly sustained another

$5.1 million in wharf damage to the downriver section of the Ergon ship dock as well as to the

Ergon barge dock. Likewise, the BRAVO needlessly sustained $1.8 million in underwater hull

damage which required substantial additional time to repair, and resultant economic loss. Any

damage award to Ergon in this matter must account for Ergon's superseding / intervening fault.

### 4.      Damages Issues

Ergon has sustained physical damages to its dock and deserves to be compensated for those

damages. However, Ergon's physical damage claim is overstated and should be reduced for

several reasons.

First, Petitioners should not be responsible for the exacerbation in damages caused by

Ergon's own negligence. Accordingly, as experts will testify, Ergon's damage award should be

reduced by $5,180,000 to account for the additional physical damage caused to the Ergon facility

due to Ergon's intervening and superseding fault, and by another $1,856,928 to account for

additional damage caused to the BRAVO due to Ergon's intervening and superseding fault (which

---

[2] In another case, the Fifth Circuit affirmed Judge Berrigan's conclusion that a dredge that had been struck by a vessel "was not in an emergency situation" where "there was no imminent danger of it sinking." *Mike Hooks Dredging Co. v. Marquette Transp. Gulf-Inland, L.L.C.*, 716 F.3d 886, 893-94 (5th Cir. 2013); *see also* Bryan J. Kitz, *Admiralty's Vestigial Tail: The Fifth Circuit Revitalizes the Outdated Pennsylvania Rule*, 38 TUL. MAR. L.J. 709, 719-20 (2014) (discussing the *Mike Hooks* decision and noting that "collision incidents may have to immediately place a ship in danger of sinking to give rise to an *in extremis* defense").

amount was included in BRAVO's now settled claim against Petitioners; the reasonableness of this settlement is not subject to serious dispute).

Second, Ergon's damages are subject to a depreciation allowance, which Petitioners' engineering expert conservatively estimates at 20%. "When repairs improve a damaged structure to a better than pre-tort condition, thus providing an extra benefit to the tort victim, a measure of depreciation is applied to the repair costs to reduce damages." *Cargill, Inc. v. Kopalnia Rydultowy Motor Vessel*, 304 Fed. App'x 278, 280 (5th Cir. 2008); *see also In re M & M Towing Co.*, 1997 WL 96377, at *1 (E.D. La. Mar. 4, 1997) ("[A] party incurring property damage is entitled to no more than restoration to the condition prior to the accident."). Here, Egon's repairs upgraded and improved the Ergon dock in comparison to its pre-allision design/condition, thereby extending its useful life. Furthermore, the evidence will show that approximately $800,000 of Ergon's claim is attributable to various upgrades and repairs of items not even damaged as a result of the allision. Any damage award to Ergon should be adjusted to account for both depreciation and these upgrades.

Third, Ergon is not entitled to pre-judgment interest. In the Pretrial Order, Ergon contends that it is entitled to "nearly $1 million" in pre-judgment interest. *See* Rec. Doc. 423, p. 11. As the Supreme Court has explained, however, "the allowance of interest on damages is not an absolute right. Whether it ought or ought not to be allowed depends upon the circumstances of each case, and rests very much in the discretion of the tribunal which has to pass upon the subject." *City of Milwaukee v. Nat'l Gypsum Co.*, 515 U.S. 189, 196 (1995). Indeed, pre-judgment interest may be disallowed "when there are 'peculiar circumstances' that would make it inequitable for the losing party to be forced to pay pre-judgment interest." *Koch Refining Co. v. Jennifer L. Boudreaux MV*, 85 F.3d 1178, 1183 (5th Cir. 1996). Here, pre-judgment interest should be disallowed because

Ergon expelled PRIVOCEAN's civil engineer Thomassie and surveyor Fernandes from the Ergon site on April 22, 2015, and prohibited their further attendance during the several months long repair period.   Ergon's unprecedented action was taken because Petitioners dared to allege Ergon's superseding/intervening fault after hearing the orders Ergon's dockman to the Good Samaritan tugs.   In addition, Ergon disposed of various dock components without giving Thomassie or Fernandes a chance to inspect them – a clear spoliation of evidence.   Finally, Ergon delayed for nearly a year to present a disorganized and incomprehensible claim and even then just produced boxes of unmarked documents with no spread sheet or summary.   Under the circumstances, then, it would be inequitable to force Petitioners to pay pre-judgment interest.   *See, e.g., Sogem-Afrimet, Inc. v. M/V Ikan Selayang*, 951 F. Supp. 429, 444-45 (S.D.N.Y. 1996) (denying pre-judgment interest where plaintiff was responsible for certain delays).

Finally, as noted above in footnote 1, any damage award to Ergon's insurers must be reduced to account for the fact that 45.5% of the Ergon property damage claim has been settled.

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY:   */s/ Gary A. Hemphill*
Gary A. Hemphill, T.A. (#6768)
William J. Riviere (#20593)
Michael M. Butterworth (#21265)
Meredith W. Blanque (#32346)
Jeremy T. Grabill (#34924)
Adam N. Davis (#35740)
Arthur R. Kraatz (#35194)
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: 504-566-1311
Telecopier: 504-568-9130
Email: gary.hemphill@phelps.com
        riviereb@phelps.com
        michael.butterworth@phelps.com
        meredith.blanque@phelps.com

jeremy.grabill@phelps.com
adam.davis@phelps.com
arthur.kraatz@phelps.com

**ATTORNEYS FOR PETITIONERS,
PRIVOCEAN SHIPPING LTD., AND
BARIBA CORP.**

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing pleading was filed on this 20th day of April

2018, with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic

filing to all participating counsel of record.

*/s/ Gary A. Hemphill*

PD.23574412.2