UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ERGON - ST. JAMES, INC., ET AL.                    CIVIL ACTION

VERSUS                                             NO: 15-1121 and
                                                   consolidated cases

PRIVOCEAN M/V, ET AL.                              SECTION: "A" (3)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This suit arises from the April 6, 2015 breakaway of the M/V PRIVOCEAN

("PRIVOCEAN") from the Convent Marine Terminal ("CMT") dock located at Mile Marker

161 on the east bank of the Mississippi River. The PRIVOCEAN broke away from its

moorings at CMT, drifted and/or travelled across the river, and allided with the M/T

BRAVO ("BRAVO"), which was moored at the Ergon – St. James terminal facility and

dock.

Ergon[1] initiated this action against the PRIVOCEAN *in rem* for all damages that

Ergon sustained as a result of the PRIVOCEAN's breakaway and subsequent events.

The PRIVOCEAN was arrested and jurisdiction over the vessel was perfected.

Privocean Shipping Ltd. and Bariba Corp., the owner and managing owner,

respectively, of the PRIVOCEAN (jointly referred to hereinafter in the singular as

"Privocean"), filed a Petition for Exoneration from, or Alternatively, Limitation of Liability

---

[1] "Ergon" comprises Ergon – St. James, Inc., Ergon, Inc., Ergon Refining, Inc., Magnolia
Marine Transport Co., and their underwriters (Certain Interested Underwriters at Lloyd's of
London and PartnerRE Ireland Insurance).

pursuant to the Shipowner's Limitation of Liability Act, 46 U.S.C. §§ 30501, *et seq.* Gard P&I (Bermuda) Ltd. ("Gard"), the P&I insurers of PRIVOCEAN, posted security in the form of a Letter of Undertaking ("LOU") and the arrest of the PRIVOCEAN was lifted.

The cases were consolidated into the instant action.

Ergon filed a Claim in the Limitation Action against Privocean and a Third-Party Demand direct action against Gard for all damages that Ergon sustained as a result of the PRIVOCEAN's breakaway and subsequent events.[2]

Numerous other claims for damages were duly filed in the limitation action, and Privocean filed third-party demands against three parties, seeking contribution or indemnity on the grounds that the fault of those parties had caused or contributed to the casualty. Prior to trial, all three of the third-party claims and all of the limitation claims except one were settled. The total amount of the settlements was such that the issue of limitation was rendered moot before trial.

Included in those settlements by Privocean was the claim of Bravo Shipping Ltd. ("Bravo") for damage to its vessel, the BRAVO. As part of the settlement with Bravo, Privocean was assigned the Bravo Shipping claim, and now seeks contribution from Ergon for certain damages that Privocean contends were caused to the BRAVO by the negligence of Ergon in the aftermath of the allision. Privocean also claims that as Bravo's assignee, it is entitled to a credit from Ergon for additional damages caused to

---

[2] Privocean points out that there is no basis for the Court to enter a judgment against Gard on Ergon's direct action because Ergon did not introduce a copy of the policy at trial or otherwise prove coverage for this particular claim. Of course, Gard remains obligated under the terms of the LOU.

the BRAVO as a result of Ergon's fault.

Prior to trial, Privocean stipulated that it is 100% liable for the breakaway of the PRIVOCEAN and the initial allision with the BRAVO at the Ergon dock.

Thus, the sole claims remaining for trial were Ergon's claim for physical damage to its facility (lower ship dock and barge dock) and for related expenses, and Privocean's claim for contribution for damage to the BRAVO (lower port side damage).

Privocean has stipulated that Ergon spent $14,607,429.00 to repair its facility and that this amount was reasonable. This stipulation was subject, however, to Privocean's claim that these damages should be reduced for depreciation, for specific instances of betterment to the facility as a result of the repairs, and due to the fact that some of the damages and corresponding repairs were necessitated by Ergon's own fault.

Consequently, the only issues for trial were: (1) whether Ergon's repair costs should be reduced on account of depreciation; (2) whether the repairs effected by Ergon resulted in specific areas of betterment or improvement of the facility in comparison to its pre-incident design such that Ergon's damages should be correspondingly reduced; (3) whether Ergon's actions after the initial allision were negligent in a way that exacerbated its damages; (4) whether Ergon's actions after the initial allision were negligent in a way that exacerbated the damages to the BRAVO; and (5) whether Ergon is entitled to pre-judgment interest and, if so, in what amount.[3]

_____

[3] A separate issue that was not tried, and therefore forms no part of these findings, is whether Ergon and its non-settling underwriters are entitled to recover 100% of the subrogated damage claim. Before trial Privocean settled a separate claim (Rec. Doc. 112) filed by certain of Ergon's other underwriters, and Privocean maintains that those settling underwriters owned 45.5% of the claim.

This matter was tried to the Court sitting without a jury on April 23-27, 2018. The parties filed their proposed Findings of Fact and Conclusions of Law on June 15, 2018. (Rec. Docs. 466 & 467). A motion to strike followed, and the Court disposed of that motion on July 30, 2018. (Rec. Doc. 475).

Having considered the testimony and evidence at trial, the depositions submitted in lieu of live testimony, the arguments of counsel, and applicable law, the Court now enters the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a). To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such. To the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

## I.
## FINDINGS OF FACT

Ergon is a crude oil storage facility that receives and stores crude oil from tank ships at its ship dock. The Ergon dock was built in 1980. In the 35 years prior to this incident, the Ergon dock had only experienced one other allision, which occurred in 2008 by a downstream tug and barge.

The Ergon facility is comprised of two parallel structures—an outer ship dock and an inboard barge dock. The two docks are separated by over 200 feet. As the name implies, the Ergon ship dock receives ocean-going vessels to discharge their cargoes of crude oil. The ship dock has an upper and a lower end, demarcated roughly in the middle by the ship wharf breasting dolphins against which ships rest while discharging and where cargo pipelines run from a vessel's manifold to storage tanks ashore. These pipelines are covered by a steel walkway. At the breasting dolphin location in the

middle of the ship dock are located three loading arms or "chicksans" which are used to connect the shore piping to the ship's manifold.

When cargo is discharged from a vessel, it is piped ashore and stored in tanks at the Ergon facility until it is ready to be transported by barge to upriver locations. The parallel barge dock, located closer to the river bank, receives the river barges into which the crude oil is loaded for transportation. Unlike certain portions of the ship dock, the barge dock is not designed or constructed to withstand the weight of ocean-going ships.

The ship dock structure comprises a series of dolphins constructed of steel pilings driven into the river bed with interconnecting steel bracing and either steel or concrete caps. Some of these dolphins, namely the ones in the middle of the ship dock, are called breasting dolphins ("BD") because they have fenders against which discharging vessels rest. Breasting dolphins are reinforced to withstand the weight of large ocean-going vessels. The fenders of the breasting dolphins at Ergon's ship dock and the center main fendered wharf face, extended outward into the river to create an imaginary "fender line" (nearly perpendicular to the steel walkway) and a properly moored vessel at Ergon's ship dock would sit nearly parallel to that line along the breasting dolphins and would not have occasion to move laterally beyond that fender line toward the river bank. The breasting dolphin sitting furthest downriver at Ergon was BD-3.

Behind that imaginary fender line were the non-reinforced structures of the Ergon ship dock, including other upstream and downstream dolphins called mooring dolphins ("MD"). Mooring dolphins are fenderless and are designed only to secure a ship's

mooring lines. Mooring dolphins are not reinforced to withstand the weight of ocean-going vessels pushing against them. The dolphins are connected by a series of walkways, or "catwalks," supported by vertical pile structures called "bents." Bents are not designed to withstand the weight of a ship at the berth but serve merely to support the metal catwalks between mooring dolphins, breasting dolphins and other structures. These non-reinforced structures and the walkways that connect them are canted away from the fender line to ensure that moored vessels do not contact them. The Ergon ship dock terminated at MD-4, which was the structure furthest downriver along the ship dock.

The pipelines running to and from Ergon's ship dock and barge dock contain approximately 10,000 barrels of oil. The storage tanks contain approximately 2,000,000 barrels of oil. When the valves on the ship dock are closed, the valves prevent the oil from flowing outward into the loading arm, but the oil remains in the lines. If the lines are punctured, there is still potential for an oil spill.

Although the great majority of the Ergon terminal was constructed 35 years prior to the casualty, the Ergon dock was in excellent condition prior to April 6, 2015. It had been well-maintained, was recently re-coated (2013) and there was no significant damage, corrosion or deterioration to the structures. The facility, as a whole, was not heavily used and only received on average a vessel per month.

The PRIVOCEAN is a large bulk carrier built in 2013. Her dimensions are 751 feet in length and 105 feet in breadth. At the time of this incident, she was only two years old, was well-maintained, and her officers and crew all were properly licensed and

certificated.

Immediately prior to the events leading up to the casualty, the PRIVOCEAN was about to complete the loading of a cargo of coal at the CMT facility on the east bank of the river near Convent, Louisiana. PRIVOCEAN was being held in place at CMT by two hold-in tugs, the TEXAS and the NED FERRY.

The BRAVO is a crude oil tank vessel with dimensions of 816 feet in length and 144 feet in breadth. Immediately prior to the events leading up to the casualty, the BRAVO had been securely berthed port side to the Ergon ship dock with its bow pointing upriver. BRAVO was completing discharge of its oil cargo at the Ergon facility, and was in the process of "stripping" its tanks to remove the small residue of cargo remaining on board. Because it was almost empty, with a forward draft of 12 feet and an aft draft of 28 feet, the BRAVO sat very high in the water with a freeboard of approximately 45 feet. There were no problems or abnormalities with the operation involving the BRAVO at the Ergon dock before the breakaway of the PRIVOCEAN and its subsequent allision with the BRAVO.

Sometime around 3:55 p.m. on April 6, 2015, during exceptionally high river conditions, PRIVOCEAN broke free from its moorings and drifted across the river. Despite the efforts of the tugs TEXAS and NED FERRY, PRIVOCEAN travelled across the river toward Ergon's facility, and it did so without any motive power because her crew did not keep the vessel's engines on standby.

It is undisputed that Ergon had nothing to do with the mooring of the PRIVOCEAN or its cargo operations at the CMT dock.

The PRIVOCEAN allided with the moored BRAVO's starboard bow and the Ergon upriver wharf located on the right descending (west) bank of the river.[4] The initial allision with the BRAVO occurred at approximately 4:00 p.m. (land-based local time). This contact caused the BRAVO's mooring lines to break.[5] At about 4:10 p.m. BRAVO began to slowly drift downriver away from the Ergon dock. BRAVO's crew was on board at the time but the bridge was unmanned. PRIVOCEAN lay on the BRAVO, and in an attempt to keep the BRAVO in place at the Ergon dock, the PRIVOCEAN's captain kept alongside the BRAVO's starboard side. PRIVOCEAN'S movement upriver and downriver against BRAVO was reminiscent of a "grinding" sort of action.

Again, Privocean has stipulated that it is 100% liable for the breakaway of the PRIVOCEAN, and the damages pertaining to the foreseeable consequences of the breakaway. Privocean does not dispute that the damage to BRAVO's starboard side (as well as port side above the waterline just forward of her midship section where BRAVO's bow initially impacted the Ergon dock) and the damage to the upriver portion of Ergon's facility were foreseeable consequences of the breakaway. Those damages are therefore not in dispute except as to depreciation and betterment regarding the Ergon damages.

---

[4] In particular, the TEXAS on PRIVOCEAN's port bow was the actual point of initial contact between PRIVOCEAN and BRAVO.

[5] Two of BRAVO's lines held following the initial impact. But when PRIVOCEAN turned to port to free BRAVO's hold-in tug G. SHELBY FREDRICHS, which was wedged between PRIVOCEAN and BRAVO, the remaining mooring lines broke and additional damage was caused to Ergon's upriver facility. Privocean does not dispute that it is responsible for this damage.

Ergon's dock operator, Kevin Labat, was the person in charge of the Ergon facility when the allision occurred. Labat's duties included monitoring the unloading process when ships were berthed at the facility. Labat had worked for Ergon for less than three years when the incident occurred and he had no marine training or experience with vessels and tugs.

Ergon kept two radios in the dock operator's shack: a company radio (whose mate was given to the BRAVO), used to communicate with berthed vessels, and a marine radio, used to communicate with hold-in tugs. Labat had not used the marine radio prior to this incident because it was not part of his ordinary job duties to give instructions to tug boats.

Labat first became aware of the allision when he noticed the BRAVO moving downriver from the Ergon dock. He then observed the PRIVOCEAN lying on the BRAVO. For safety reasons, Labat closed the dock valves and moved off the dock and up on the levee on the west side of the river. Labat called the facility manager, Shane Rougee, who had left for the day. Rougee immediately returned to Ergon but he did not go to the dock area. Rougee stayed in Ergon's land-based office during the entire incident and turned his marine radio down so that he could make all necessary notifications. Labat therefore remained in charge of the response on Ergon's behalf.

Labat became concerned about the BRAVO's movement downriver away from Ergon's dock. Without first attempting to contact the BRAVO on the ship radio to determine whether she had the ability to stay on station without assistance, such as by dropping her anchors, Labat began calling for assistance from other vessels on the

marine radio.

Two "Good Samaritan" tugs, the BECKY S and the ELIZABETH B, responded to Labat's call and came to the scene shortly after 4:25 p.m. Even though he had no basis for understanding how the tugs could best be utilized or what effect their pushing on BRAVO would have, at about 4:27 p.m., Labat asked the BECKY S to "please push the BRAVO forward—it cannot go any more back." Labat reiterated, "I need you to push the BRAVO up and forward—it cannot go any more back." BECKY replied (Trent Taylor), "All right, I'm pushing up and on I got the ship . . . I'm pushing hard in the ship trying to keep it along the dock and I'll try to keep it up as far as possible. You got another tug coming along side to help you keep you on the dock." A few seconds later, Labat advised that the BRAVO was still falling back. Labat reiterated, "Please push forward with the tugs, please." BECKY S confirmed that she was pushing as far forward as she could given that BRAVO had another ship lying on her.

ELIZABETH B came along shortly thereafter (4:28 p.m.), and her captain testified that the PRIVOCEAN already had her engines going and was preparing to pull away as he was arriving. Both tugs pushed on the BRAVO, just astern of her midship section. Therefore, the tugs began to assert their combined full force on the BRAVO very close in time to when the PRIVOCEAN was beginning to pull away.

The ELIZABETH was positioned almost parallel to the BECKY. The tugs were pushing with 100 percent of their force. Even though the tugs were trying to push the BRAVO forward, the tugs were pushing at an 80 to 90 degree angle (nearly perpendicular) to the hull because neither tug had lines running to the BRAVO.

BECKY S is 100 feet in length and 36 feet in breadth, with engines generating 4,480 horsepower. ELIZABETH B is 98 feet in length and 35 feet in breadth, with engines generating 4,000 horsepower. Each tug had an effective bollard pull rating of 55 tons, meaning that they had a total pushing power of 55 tons. This is equivalent to 110,000 pounds per tug in thrust, or 220,000 pounds total thrust for both tugs together.

Eventually, BRAVO drifted back to the point where its bow was just at or below BD-3, the last breasting dolphin in the series of breasting dolphins that created the fender line. This meant that there was no structure in place to prevent the port side of the BRAVO from contacting the portions of the Ergon ship dock below BD-3, which were not reinforced to withstand the weight of a vessel.

The BRAVO was pushed completely over the unfendered downriver end of the Ergon ship dock, totally destroying the downstream mooring dolphin MD-4. Mooring dolphin MD-4 had to be completely replaced along with associated sections of the connecting gangways and bents that formed the lower ship dock. When the BRAVO was pushed over MD-4 this caused substantial damage to the bottom edge port bilge strake and keel of her hull.

When BRAVO's bow began to move to port through the lower ship dock, PRIVOCEAN was alongside BRAVO in the process of finally pulling away. The damage to the structures downriver of BD-3 was caused by PRIVOCEAN and the tugs acting together, even though the combined strength of the tugs would have been powerful enough to topple the lower ship dock even without PRIVOCEAN's contribution to this part of the casualty.

Several experts testified as to the cause of this aspect of the casualty. All of the experts concur in that the PRIVOCEAN's presence alongside the BRAVO contributed in one manner or another to push BRAVO's bow through the catwalk and bents of the lower ship dock downriver of BD-3. PRIVOCEAN's expert, Jason Fernandes, believed that it was the tugs acting alone that toppled MD-4, which is the structure furthest downriver on the lower ship dock. The Court found Mr. Fernandes to be credible and his opinions well-supported but as to the damage to the lower ship dock structures, no line of demarcation can be drawn where the damage from the PRIVOCEAN and the tugs acting together ends and the damage attributable to the tugs alone begins.

The cost to repair the lower ship dock was $4,580,000.00.

The PRIVOCEAN pulled clear of the BRAVO sometime after 4:35 p.m., and when she did so the Ergon barge dock tripod mooring dolphin, which was several hundred feet away from the ship dock, was still intact. The damage to the barge dock structure occurred several minutes after the damage to the downriver ship dock. The footage from Ergon's dock cam and the Caddo video establish without a doubt that PRIVOCEAN was not alongside BRAVO after she passed over MD-4 and moved laterally toward the barge dock. Clearly, the damage to the barge dock tripod mooring dolphin and the barge dock gangway was caused solely by the tugs. The cost to repair the damage to the barge dock was $600,000.00.

Although the damage to the lower ship dock (including MD-4) is attributable to PRIVOCEAN acting in concert with the tugs, the BRAVO overcame the resistance of MD-4 and moved laterally over that dolphin (and the remains of the rest of the lower

ship dock) causing significant below water-line damage to the hull solely because the powerful tugs were pushing on her starboard side. Before BRAVO began to move laterally toward the shore and over MD-4 her bow moved slightly outward toward the river and that could only have happened if PRIVOCEAN had already pulled away from the BRAVO and cleared her. PRIVOCEAN did not contribute to pushing the BRAVO laterally over the remains of the lower ship dock and MD-4.[6]

The experts who opined that BRAVO would have moved over the lower ship dock with or without the tugs—in other words that PRIVOCEAN alone caused the BRAVO to move over MD-4 toward the barge dock—were simply not persuasive. The objective evidence such as PRIVOCEAN'S VDR data, and the circumstantial evidence such as the lack of significant damage to BRAVO's starboard bow, and the fact that PRIVOCEAN was already either lying on the BRAVO or in very close proximity to her when she pulled away, did not support the proposition that PRIVOCEAN struck the BRAVO's bow with so much force as to cause enough residual momentum to not only push BRAVO into the lower ship dock but to then proceed to move her laterally over the collapsed ship dock and MD-4, even after her bow came back out toward the river. MD-4, while not reinforced like a breasting dolphin, was far stronger than the catwalks and

---

[6] The Court recognizes that while MD-4 was certainly damaged when the BRAVO's bow took out the lower ship dock, it is not beyond possibility that the need to completely replace that structure (in lieu of less expensive repairs) might be attributable to the BRAVO's hull passing over MD-4, an act which the Court attributes solely to the tugs. Because the evidence does not adequately answer this question, the Court places full responsibility for the replacement cost of MD-4 on Privocean.

bents that are built to withstand only wind and river current. PRIVOCEAN had already pulled away and was well clear of BRAVO when the lateral movement stopped.

The PRIVOCEAN did not push the BRAVO, which was 816 feet long, laterally over MD-4 thereby damaging the port bilge strake and keel of BRAVO's hull. The two tugs BECKY S and ELIZABETH B had sufficient combined thrust to push BRAVO, which was empty of her cargo and sitting high in the river, over MD-4 without any help from PRIVOCEAN. Again, the steady and near perfect lateral movement of the BRAVO can only have been attributable to the continued force delivered by the tugs pushing at full force nearly parallel to the hull and just astern of the midship area.

The Court credits the methodology used by Privocean's expert, Jason Fernandes, to apportion the repair costs for the BRAVO. The additional cost to the BRAVO for the damages that resulted from pushing the vessel over the lower ship dock and MD-4 was $1,856,926.00.

When the BRAVO finally dropped her starboard anchor the vessel stopped moving.

Because BRAVO was nearly empty, its freeboard was much higher than the bridge of the tugs, meaning that the operators of the BECKY S and ELIZABETH B could not see what was on the other (port) side of BRAVO, and in particular could not see that BRAVO had drifted back and therefore was pressing on the unfendered portions of the lower ship dock, which again was not built to withstand the weight of a ship. They had to operate blindly, and their only option was to rely on instructions from Labat as to what they were to do.

Similarly, the crew that was on the bridge of the BRAVO at the time couldn't see the tugs. BRAVO's captain did not know that the tugs were pushing on his vessel until almost 5:00 p.m. So, Labat was the only one who had a clear and unobstructed view of the BRAVO; the only one who knew that he had ordered two powerful tugs to push hard on its starboard side; and the only one who could see that the BRAVO was being pushed over the ship dock and toward the barge dock, which it eventually struck and destroyed.

Only Labat knew that the BRAVO was no longer resting on the reinforced breasting dolphins yet he watched, and calmly took pictures, as the BRAVO was pushed over the downriver portions of the Ergon ship dock and the barge dock. He never attempted to communicate with the tug operators to tell them to stop pushing. Had he done so, significant additional damage to the hull of the BRAVO and the damage to the barge dock could have been avoided.

## II.
## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1333, which confers on federal courts original jurisdiction over admiralty and maritime claims. Venue is proper in this district because the casualty involved in the litigation occurred in this district. Jurisdiction and venue are not contested.

### A.    Depreciation

The repairs to the Ergon dock are subject to depreciation. *See Pizani v. M/V Cotton Blossom*, 737 F.2d 1334 (5th Cir. 1984).

The useful life of a structure measures how long the structure is usable for its intended purpose. The average useful life for a structure on the river, such as Ergon's facility, is 50 to 60 years. A structure may be fully functional but that does not mean that none of its useful life has been depleted.

Even though some of the structures at Ergon's facility had been repaired or replaced over the years, most of the replaced structures were 35 to 36 years old. Some of the structures at the facility were depreciated by 60 percent, some by 43 percent, and some by 14 percent, depending upon the age of the structure.

Even though Ergon's facility had been well-maintained, the useful life of the structures (parts of which are below the water line or underground) still decreases with time. Even the most diligent maintenance will not make the structures last past their useful life.

The Court found unpersuasive Ergon's contention that the useful life of the facility was not extended by the extensive repairs following the incident. Ergon's contention that the useful life of the facility was 50 years both before and after the incident was not plausible. It is clear that the extensive repairs to Ergon's facility extended its useful life.

Privocean's expert Bill Thomassie did not apply depreciation on a structure by structure basis but instead posited the very conservative estimate of 20 percent depreciation across the board, assuming a generous useful life of 60 years. The 20 percent factor is very conservative considering that most of the affected structures were over 30 years old. The Court will adopt this factor but only to Ergon's "hard" or "permanent" repair costs of $7,853,992.00.

## B. Betterment

With respect to upriver components MD-1 and MD-1A Privocean seeks to reduce Ergon's recovery by $700,000 due to betterment.

The replaced structures had to be rebuilt to current code standards. Some of the admitted improvements to MD-1 and MD-1A were attributable to replacing them with a design similar to that used for MD-4, because doing so was more cost efficient.

The Court credits the testimony of Ergon's expert/fact witness, Jeff Mazzanti, who testified that all of the replacements were in kind. The Court also found Mr. Mazzanti to be credible as to the reasons that MD-1A was ultimately replaced instead of being repaired.

The Court will not reduce Ergon's recovery due to betterment beyond what the Court has already credited for depreciation, which in this case is sufficient to encompass any betterment.

## C. Ergon's Negligence

Privocean contends that Labat's decision to employ the tugs and then fail to properly monitor their actions exacerbated Ergon's damages beyond those that were foreseeable as a result of the initial allision. Privocean raises a separate contention that Ergon was negligent for failing to train Labat and for failing to have an emergency procedure in place to address a situation like this one. Relying on the doctrine of superseding cause, Privocean contends that its liability for the breakaway should end where Ergon's own negligence began to cause damage beyond what was foreseeable

from the breakaway.[7]

As to the damage to the lower ship dock, which was caused by a combination of the PRIVOCEAN and the tugs acting together, Privocean has not established that any negligence on the part of Ergon or its personnel constituted a superseding cause so as to cutoff liability for PRIVOCEAN's fault deriving from the breakaway.

The superseding cause doctrine applies where the defendant's fault in fact substantially contributed to the plaintiff's damage, but the damage was actually brought about by a later cause of independent origin that was not foreseeable. *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 367-68 (5th Cir. 2006) (citing Schoenbaum, Admiralty and Maritime Law 165 (2d ed. 1994)). It is predicated on the notion that "there must be a terminus somewhere, short of eternity, at which the second party becomes responsible in lieu of the first." *Id.* (quoting *In re Kinsman Transit Co.*, 338 F.2d 708, 722 (2nd Cir. 1964)).

The Court is persuaded that PRIVOCEAN's fault deriving from the breakaway did

---

[7] Ergon urges the Court to apply the presumptions of fault under the *Louisiana* and *Oregon* rules. *See Combo Maritime, Inc. v. U.S. United Bulk Terminal*, LLC, 615 F.3d 599 (5th Cir. 2010) (citing *The Louisiana*, 3 Wall. (70 U.S.) 164, 173 (1866); *The Oregon*, 158 U.S. 186 (1865)). This case involves the application of both rules given that one applies to vessels adrift and one applies to vessels moving under their own power. When PRIVOCEAN broke free and drifted across the river she did so with no motive power, thereby implicating the *Louisiana* rule as to the initial allision. The damage to the Ergon lower ship dock occurred while PRIVOCEAN was pulling away under motive power thereby triggering the *Oregon* rule as to the damage to the lower ship dock. The legal presumptions under both rules are similar.

Privocean has overcome the presumption of fault under both rules insofar as the damage to the BRAVO's hull and Ergon's barge dock are concerned. As to those categories of damage, none of the statutory violations that Ergon points to in its briefing were a cause in fact of the damage, which occurred well after the initial allision and only with the action of the tugs. *See The Pennsylvania*, 86 U.S. 125 (1873). As to any statutory violations that might have been a cause in fact of the breakaway and resulting damages, Privocean has already stipulated to liability.

not abate until the vessel left Ergon's facility. But even if it did abate at some point before the PRIVOCEAN left the scene, it was surely an act of new fault to combine with the tugs to push the BRAVO through the lower ship dock.

Further, PRIVOCEAN was completely at fault for BRAVO's movement away from the dock and it was certainly foreseeable that Ergon's dock man would take some action to keep the vessel from drifting away. In choosing a course of action, Labat was required to exercise ordinary care, and the Court is not persuaded that Labat's decision to ask the tugs to push forward breached the duty of ordinary care under the circumstances. *See In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 211 (5th Cir. 2010). Hindsight has revealed that Labat perhaps should have taken a different course of action, but his fear and concerns when BRAVO began to drift away from the dock were not unreasonable, and they were not based on a failure to train or lack of a procedures manual. What they were based upon was a difficult and stressful situation that was foisted upon Ergon's personnel without warning or notice and without any fault on their part.

It is impossible to know how much of the lower ship dock damage was attributable to the tugs pushing on BRAVO and how much was attributable to PRIVOCEAN pulling away from Ergon's facility. In other words, there is no basis short of sheer guesswork to apportion fault between the tugs and PRIVOCEAN. But given that PRIVOCEAN was responsible for the CMT breakaway, and given that PRIVOCEAN upon finally pulling away caused the BRAVO to destroy Ergon's lower ship dock, any negligence that Labat or Ergon might have committed related to summoning the tugs,

would not be a superseding cause of the damage to the lower ship dock. PRIVOCEAN is liable for the damage to the lower ship dock.

Where Labat's conduct did fall below the duty of ordinary care, however, was in in failing to countermand his order to the tugs over an extended period of time when the BRAVO was pushed laterally over the lower end of the Ergon ship dock thereby causing significant additional damage to the BRAVO's hull. While Labat stood and watched, took pictures, and even spoke with BRAVO's chief officer, BRAVO was pushed not only over the ship dock, but all the way into the barge dock several hundred feet away causing another $600,000 of damage to that part of the facility. It was completely foreseeable to Labat that absent taking action the BRAVO would continue to be pushed laterally over the lower ship dock structures, causing significant additional damage to the BRAVO, and then damage to the barge dock.

Labat was the only person who could see the budding consequences of his order to the tugs and hence the only person who was in a position to avoid the damage which ensued when, despite visual evidence that he should take action, he did nothing. Labat could perhaps not have been faulted if he had gone across the levee and stayed there, as his supervisor had told him to do over the phone, but when he took it upon himself, as a non-mariner, to come back to the dock area and then direct the actions of the Good Samaritan tugs, he assumed a duty to perform those functions with reasonable care. This he failed to do.

Labat's negligence in this regard cannot be excused by the *in extremis* doctrine. The *in extremis* doctrine is typically applied to excuse errors in judgment committed in

the short interval just before a collision or allision—in other words, when an emergency suddenly arises and a peril is imminent. *See, e.g., Crescent Towing & Salvage Co. v. CHIOS BEAUTY MV*, 610 F.3d 263, 268 (5th Cir. 2010); *Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81, 84-86 (5th Cir. 1960).

Assuming that the doctrine could apply as a matter of law to Labat's land-based negligence, the facts simply do not support the contention that Labat's continued failure to order the tugs to stop pushing, even as he observed BRAVO being pushed over the ship dock and into the barge dock several hundred feet away, falls within the scope of protection afforded by the *in extremis* doctrine. However, even if the *in extremis* doctrine were to apply for some short period of time following the initial impact at 4:00 p.m., it does not remain in effect from the time the risk to the Ergon dock was known at 4:00 p.m. until a full 30-35 minutes later. This is especially true in light of the fact that Labat himself was taking pictures and walking back and forth on the Ergon dock main causeway during this period of time.

Privocean has established that Ergon's negligence was a superseding cause of the additional damages of $1,856,926.00 that were sustained by the BRAVO as a result of being pushed over the lower dock structures, especially MD-4, by the ELIZABETH and the BECKY. Since these extra damages were caused by Ergon, and in light of the assignment to Privocean of Bravo's damage claim, the Court concludes that Privocean is entitled to a credit in this amount against the judgment to be awarded to Ergon.

Privocean has also established that Ergon's negligence was a superseding cause of the damage to the barge dock, which cost $600,000.00 to repair.

### D. Prejudgment Interest

Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and in practice, is "well-nigh automatic." *Offshore Marine Contractors, Inc. v. Palm Energy Offshore, L.L.C.*, 779 F.3d 345, 351 (5th Cir. 2015).

The Court finds that Ergon is entitled to recover pre-judgment interest from the date this lawsuit was filed (April 9, 2015), and post-judgment interest as provided by law.

Ergon has claimed in the Pre-Trial Order that it is entitled to recover interest (three years post-casualty) of "nearly $1 million" on a total damage claim of $14.6 million. This equates to an annual rate of interest of approximately 2.2% per year. Since Ergon cannot recover damages in excess of what it claimed in the Pre-Trial Order, and because the Court finds that 2.2% per year is a reasonable rate of interest in this case, that is the rate which will be applied to the final damage figure awarded.

### E. Conclusion

To summarize the Court's findings of fact and conclusions of law, once all deductions and credits are applied to Ergon's gross damage claim, the Court finds that the subtotal of the award in damages against Privocean Shipping Ltd. and Bariba Corp., is as set forth below, plus pre-judgment interest at the rate of 2.2% per year running from April 6, 2015, to be applied to the amount awarded in the final judgment.

| | | |
|---|---|---:|
| Gross Damage Amount As Per Stipulation | | $14,607,429.00 |
| Less Depreciation | (-) | 1,570,798.40 |
| Less Betterment | (-) | 0.00 |
| Less Exacerbation of Ergon Damages (barge dock only) | (-) | 600,000.00 |
| Less Exacerbation of Bravo Damages | (-) | 1,856,926.00 |
| **SUB TOTAL** | | **$10,579,704.60** |

Privocean has contended that among the claims settled prior to trial was a separate and distinct claim brought by other subrogated underwriters of Ergon who collectively owned 45.5% of Ergon's total insurance cover for this loss. According to Privocean, the final judgment which will be entered in due course in favor of the remaining Ergon interests should reflect this settlement by reducing the recovery of the underwriters whose claim was the subject of the trial by 45.5% of the total subrogated damage claim value as determined by this Court. Ergon maintains that it is entitled to recover 100% of it subrogated losses. This issue will be resolved before entry of a final judgment. Therefore, within **fifteen (15) days** of entry of these findings, Privocean shall file its motion to limit Ergon's recovery, to be noticed for a regularly scheduled Section A submission date.

August 13, 2018

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE