UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ERGON - ST. JAMES, INC.                        CIVIL ACTION

VERSUS                                          NO: 15-1121 and
                                                consolidated cases

PRIVOCEAN M/V, ET AL.                          SECTION: "A" (3)

**ORDER AND REASONS**

The following motions are before the Court: **Motion for Modification and/or Reconsideration of Court's Findings of Fact and Conclusions of Law (Rec. Doc. 479)** filed by Ergon – St. James, Inc., Ergon Refining, Inc., and Magnolia Transport Co. (collectively "Ergon") and their Underwriters;[1] **Motion to Limit Recovery of Ergon and Certain of Its Underwriters (Rec. Doc. 480)** filed by Privocean Shipping, Ltd. and Bariba Corp., as owners and managing owners respectively of the M/V PRIVOCEAN.

Both motions are opposed. The motions, noticed for submission on September 19, 2018, are before the Court on the briefs without oral argument.

**I.**

Ergon[2] moves the Court to reconsider its determination that Ergon's recovery should

---

[1] The "Underwriters" are: "Certain underwriters are foreign organizations and underwriters of insurance policies. These underwriters subscribed to Lockton London Contract Nos. PE1410635, PE1410636, PE 1410633 and PE1410695. Specifically, certain underwriters include Certain Interested Underwriters at Lloyd's of London and its Members, comprised of a group of syndicates acting by and through their appointed active underwriters, including Syndicates 435, 1967, 318, 510, 1225, 33, 2623, 623, 1969, 2001 and 1200 (collectively "Lloyd's") and PartnerRe Ireland Insurance. At all times described herein, certain underwriters provided a policy(ies) of insurance to Ergon-St. James, Inc., Ergon, Inc., and/or Ergon Refining, Inc." (Rec. Doc. 101, Claim and Third-Party Demand ¶ 5).

[2] Because the interests of Ergon and its co-claimant underwriters are completely aligned, for purposes of the Motion for Modification and/or Reconsideration only, the Court refers to them collectively as "Ergon."

1

be reduced by $1,856,926.00. This is the amount of damages that the Court attributed to Ergon's negligence in pushing the BRAVO completely over MD-4 at the lower end of the Ergon ship dock. Ergon argues that it was inconsistent for the Court to find the PRIVOCEAN liable for the destruction of the lower ship dock and MD-4 while at the same time holding Ergon responsible for the damages to the BRAVO's lower port side hull—damages that the Court found to be caused by the BRAVO being pushed over MD-4.

For the detailed reasons given in the Court's Findings of Fact and Conclusions of Law (Rec. Doc. 476), it was the tugs acting alone that pushed the BRAVO over MD-4, causing significant damage to the vessel's lower hull. The PRIVOCEAN was clear of the BRAVO when this occurred. Any perceived inconsistency in the findings derives from the Court's conclusion that Privocean should pay for the cost to replace MD-4. As the Court explained in its findings, it was possible that the need to replace MD-4 (as opposed to simply repairing it) was attributable to the BRAVO passing over MD-4, an act that was caused by Ergon's own negligence. On the other hand, it was also possible that MD-4, which clearly sustained some amount of damage even before the BRAVO passed over it, would have required replacement no matter what. The Court resolved the dispute in Ergon's favor by casting Privocean with the cost of replacing that dolphin.[3] The motion for reconsideration is therefore denied except insofar as the Court does agree that the BRAVO repair costs should not be "deducted" from Ergon's judgment against Privocean but rather should form the basis of a separate judgment in favor of Privocean and against Ergon. The

---

[3] In fact, the Court was inclined to deny Ergon's recovery for the replacement cost of MD-4 based on the testimony of Privocean's expert, Jason Fernandes, whom the Court found to be credible and persuasive. That witness testified that it was the tugs acting alone that damaged MD-4 without any help from PRIVOCEAN. If the Court was persuaded that its findings were irreconcilable as to the BRAVO and MD-4, then the Court would simply deny Ergon recovery for the cost of replacing MD-4.

final judgment will reflect this point.

II.

Privocean moves the Court to give recognition to the settlement that it reached with some of Ergon's underwriters ("the Settling Underwriters") prior to trial. Privocean contends that Ergon and the Underwriters are only entitled to recover 54.5% of the damages found by the Court at trial. Although Privocean has styled its motion as one to "limit" Ergon's recovery, Privocean's motion raises the issue of whether Ergon and its Underwriters (hereafter "the Non-Settling Underwriters") actually own 100% of the claim that was tried to the Court. The issue further boils down to whether the Settling Underwriters were subrogated to Ergon's rights against Privocean.[4]

The "subrogated" underwriters split their claim against Privocean into two parts: 1) the claim jointly asserted by Ergon and the Non-Settling Underwriters, and 2) the claim separately asserted by the Settling Underwriters, who undisputedly insured 45.5% of the risk on Ergon's property damage policy. For reasons that remain unknown, the full complement of the underwriters that insured the risk on Ergon's property damage policy declined to pursue their subrogation rights against Privocean together or to be represented

---

[4] Ergon's and the Non-Settling Underwriters' reliance on *McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994), and the collateral source rule is misplaced. Privocean is not trying to reduce its own liability for damages by relying on the insurance payments that the Settling Underwriters made to Ergon. Rather, Privocean paid those Settling Underwriters directly to "buy them" out of the case for their share of the litigation assuming of course that they were properly subrogated to an interest in the litigation. As for *AmClyde*, that decision dealt with multiple defendants, not plaintiffs.
    Ergon also argues that the Rules of Evidence preclude consideration of Privocean's settlement with the Settling Underwriters. This argument, which Privocean characterizes as legally frivolous, is unpersuasive.
    Ergon's reliance on the policy's waiver of subrogation clause is similarly misplaced. None of the underwriters have sought subrogation against Ergon. Rather, the issue is one of Ergon's ownership of the claim that it tried in light of the significant insurance proceeds that it received from the underwriters, and the policy's subrogation clause. (Rec. Doc. 480-6, Exhibit 5).

by the same counsel.[5]

As noted above, the actual issue before the Court is whether and to what extent the Settling Underwriters were subrogated to Ergon's rights against Privocean. Ergon and its co-plaintiffs, the Non-Settling Underwriters, deny that the Settling Underwriters were actually subrogated to pursue Ergon's claims against Privocean. Thus, their position is that Privocean settled with a party with no rights in the litigation.

The Court finds this argument to be a specious one given that the Non-Settling Underwriters have asserted claims in this litigation—claims in which Ergon has joined—solely by virtue of the fact that they claim subrogation in their favor. Ergon and the Non-Settling Underwriters point to nothing to suggest that the Settling Underwriters are positioned differently than the Non-Settling Underwriters for purposes of subrogation. If the Non-Settling Underwriters are entitled to subrogation—an issue that Ergon has judicially admitted—then the Settling Underwriters are also entitled to subrogation. Having failed to point to anything that would suggest that the Settling Underwriters are not similarly situated to the Non-Settling Underwriters' rights, Ergon and the Non-Settling Underwriters might very well be estopped from even arguing that the Settling Underwriters have no subrogation rights in this matter.

The policy contains a subrogation clause: "In the event of any payment under this policy, **Insurers shall be subrogated to the extent of such payment to all the Insured's rights of recovery there from**." (Rec. Doc. 480-6, Exhibit 5) (emphasis added). It further states: "If any amount is recovered, after deducting the costs of such recovery, **such**

---

[5] In its opposition Ergon discusses a previously undisclosed agreement with some of the underwriters regarding recovery at trial and increases to Ergon's annual insurance premiums. Any connection between this agreement and the claim split is not clear, however.

4

***amount shall be divided between the interests concerned in the proportion of their respective interests***." (*Id.*) (emphasis added).

Ergon has received at least $12,910,918.43 dollars from its underwriters.[6] Ergon argues that its underwriters were never subrogated to its rights against Privocean because Ergon was not fully compensated or "made whole" following the Privocean incident. Ergon advises that as of the time of trial its insurers had not paid Ergon in full for all of the insured and uninsured losses. (Rec. Doc. 483-2, Exhibit 2 Ezell decl. ¶¶ 23, 24). Relying on Mississippi law (as explained in *Hare v. State of Mississippi*, 733 So. 2d 277 (Miss. 1999)), which governs the policy, Ergon argues that its underwriters never obtained contractual subrogation rights because Ergon still had unpaid uninsured and insured losses at the time of trial.[7]

In *Hare*, the plaintiff was injured by an uninsured motorist. His healthcare provider paid about $6,000 for medical expenses, which did not cover all of them. Although the plaintiff was legally entitled to receive at least $50,000 in compensatory damages for his injuries, he actually received only $10,000 from his own UM carrier. The medical provider claimed subrogation vis à vis the UM payment. But the state supreme court held that the medical provider could not exercise its contractual subrogation rights because the plaintiff

---

[6] Ergon has never divulged the total amount of insurance proceeds that it received from the underwriters. In its briefing Privocean states that the insurers paid Ergon approximately $14 million in insurance proceeds, over and above the deductible/waiting period amount of slightly more than $650,000.00. (Rec. Doc. 480-1 at 3). The record indicates that Ergon was paid at least $12,910,918.43 by its insurers but the document evincing this amount is undated. (Rec. Doc. 480-4 Exhibit 3). Thus, the Court has no way of knowing what the insurers had paid Ergon as of the time of the trial.

[7] For purposes of this argument, the Court refers to the underwriters collectively. Again, the Court can discern no distinction between the Settling Underwriters and the Non-Settling Underwriters for purposes of subrogation. If Ergon is challenging the subrogation rights of the Settling Underwriters then it must challenge the subrogation rights of the Non-Settling Underwriters.

5

had not been "made whole" for his extensive personal injuries. *Hare*, 733 So. 2d at 284. The crux of the court's reasoning was that the purpose of subrogation is to prevent double recovery by the insured but until an insured is fully compensated there cannot be a double recovery. *Id.*

Even though the case did not involve Mississippi law, the Court agrees with the reasoning that Judge Fallon employed in *Global International Marine, Inc. v. US United Ocean Services, LLC*, No. 09-6233, 2011 WL 2550624 (E.D. La. June 27, 2011), regarding the made whole doctrine and subrogation. In that case Judge Fallon explained that for purposes of the subrogation analysis, the made whole doctrine focuses on the element of damages covered by the policy, not every element of damages that the plaintiff suffers. In other words, the relevant "loss" for which the plaintiff must be made whole before subrogation applies is the specific loss that the subrogating insurer covered.[8]

Assuming that Ergon has some unpaid insured and uninsured losses (like for instance, its deductible and waiting period expenses of $650,238.00), Ergon cannot garner a complete double recovery in this case by keeping the $12 million plus dollars in insurance proceeds that it received and by also collecting 100% of the judgment in this case, all to the exclusion of its underwriters. That result would be completely at odds with *Hare*. The Court recognizes that Ergon had different types of damages as a result of the Privocean incident—for instance property damages and business interruption damages. The Court is convinced that uncompensated business interruption losses (if those exist) would not trigger

---

[8] To be clear, even though *Global International Marine* was not based on Mississippi law, the reasoning is consistent with the disposition in the *Hare* decision. In *Hare* the medical insurer tried to subrogate against a UM payment that was not associated with a specific element of damages, much less medical payments.

the made whole doctrine to prevent a property insurer from subrogating against a property damage award arising from the same incident. Likewise, uninsured property losses would not deprive the property insurer of its subrogation rights because the insurer is not required to pay for losses that are not covered by its policy in order for subrogation to apply. Items such as the deductible and waiting period are not covered by the policy so they will never form part of the subrogated claim. If Ergon were correct on these points then no insurer would ever be entitled to subrogation.[9]

The Court agrees with Privocean's characterization that Ergon's arguments really have to do with how Ergon and its underwriters will or should allocate between themselves the total recovery awarded by the Court. (Rec. Doc. 489, Reply at 4). In other words, the actual point of contention in this case is between Ergon and its underwriters, as was the case in *Global International Marine*, not between Privocean and Ergon. Ergon's arguments to the contrary notwithstanding, the issue is not whether the underwriters are subrogated or not subrogated to Ergon's rights because Ergon admitted that the underwriters were subrogated to its rights when Ergon joined with the Non-Settling Underwriters to file a claim against Privocean. The issue is whether the underwriters were subrogated to 100% of Ergon's rights against Privocean and therefore "own" 100% of the claim to the complete exclusion of Ergon. The Court can reduce the award by 45.5% only if the claim is owned completely by the underwriters because such a reduction, which is based on the percentage of the risk that the Settling Underwriters insured, necessarily implies that the Non-Settling

---

[9] To really confuse matters, Ergon also contends that it has insured losses that its underwriters never paid. To the Court's knowledge, there is no unresolved claim pending in this litigation for unpaid first party insurance recovery brought by Ergon against its underwriters.

Underwriters own the other 54.5% of the claim to the complete exclusion of Ergon.[10]

While the Court seriously questions whether the "made whole" doctrine renders no part of the claim in this case subject to contractual subrogation (which is Ergon's contention), the Court is persuaded that it lacks sufficient information to conclude whether the gross award should be reduced by the full extent of the Settling Underwriters' 45.5% of the insured risk.

Privocean advises that if the judgment should not be reduced by 45.5% because of the settlement then Privocean would not be required to fund the settlement with the Settling Underwriters and would instead pay the unreduced award to Ergon and to all of its underwriters, both those that settled and those that did not. Privocean advises that from a financial perspective, Privocean is indifferent as to which outcome is ultimately reached.

In light of Ergon's and the Non-Settling Underwriters' objection to the 45.5% reduction, the Court will enter a final judgment against Privocean in the amount of $12,436,630.60 in favor of Ergon and all of its underwriters. The Court will likewise issue a judgment in favor of Privocean and against Ergon in the amount of $1,856,926.00 for the damage to the BRAVO. Privocean will not be required to fund the settlement that it had reached with the Settling Underwriters.[11]

Accordingly, and for the foregoing reasons;

---

[10] Note, Ergon and the Non-Settling Underwriters with whom it joined to file suit may very well have an agreement between themselves to allow Ergon to share in a portion of the 54.5% of the claim that those underwriters own. That agreement, if there is one, would not affect the percentage of the claim that the Settling Underwriters owned.

[11] Ergon has attached to its opposition statements that the Court made to counsel from the bench when Privocean's counsel attempted to inform the Court about the settlement with the Settling Underwriters. (Rec. Doc. 483-3, Exhibit 3). The Court's statements alluding to the risk that Privocean may have settled too high or too low obviously did not envision a situation where the settling party's ownership interest in the litigation has now been questioned.

**IT IS FURTHER ORDERED** that the **Motion for Modification and/or Reconsideration of Court's Findings of Fact and Conclusions of Law (Rec. Doc. 479)** filed by Ergon – St. James, Inc., Ergon Refining, Inc., and Magnolia Transport Co. (collectively "Ergon") and their Underwriters is **DENIED;**

**IT IS FURTHER ORDERED** that the **Motion to Limit Recovery of Ergon and Certain of Its Underwriters (Rec. Doc. 480)** filed by Privocean Shipping, Ltd. and Bariba Corp., as owners and managing owners respectively of the M/V PRIVOCEAN is **DENIED** as explained above.

October 17, 2018

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE